# EXHIBIT 2



**Sing Fuels Pte. Ltd.**                    **Terms and Conditions**

## TERMS AND CONDITIONS OF SALE FOR MARINE FUELS 2017

The following terms and conditions shall apply to all sales of marine bunker fuels and related products of whatever type or grade by the Seller to the Buyer (as defined below).

**1.      APPLICATION**

1.1      The Terms and Conditions together with a Sales Order Confirmation (collectively, the "**Contract**") shall contain the entire agreement between the parties and supersede all prior agreements, arrangements, understandings, representations and/or warranties made in respect of this and previous transactions. In the event of any inconsistency or conflict between the Sales Order Confirmation and the Terms and Conditions, the Sales Order Confirmation shall take precedence.

1.2      The Seller reserves the right to, at its sole discretion, revise and amend the Terms and Conditions herein from time to time and without notice.

**2.      INTERPRETATION**

2.1      In these Terms and Conditions:-

"**Buyer**" means the party or parties described in the Sales Order Confirmation and shall include the Vessel, the Owner, her master, operators, any party benefiting from consuming the Products, and any other party ordering the Products, all of whom shall be jointly and severally liable as the Buyer under the Contract. All references to the Buyer shall include their servants, agents, successors, subcontractors, assigns, designated representatives, principals (whether disclosed or undisclosed).

"**business day**" means any day other than a Saturday, Sunday or public holiday in Singapore, or any day other than a rest day or public holiday at the place of delivery, as the case may be.

"**Code**" means the Technical Reference Bunker Mass Flow Metering TR 48 : 2015 (as amended and/or supplemented from time to time as at the date of delivery of the Products) ("**TR 48**"), or in the event the TR 48 is inapplicable, the Singapore Standard Code of Practice for Bunkering SS 600 : 2014 (as amended and/or supplemented from time to time as at the date of delivery of the Products) ("**SS 600**"), but always excluding the Bunker Claims Procedure in both TR 48 and SS 600.

"**Contract**" means the contract for the purchase and sale of Products between the Buyer and the Seller, comprising the Sales Order Confirmation and the Terms and Conditions.

"**Invoice Price**" shall have the meaning in Clause 4.3.



**Sing Fuels Pte. Ltd.**                    **Terms and Conditions**

"**Price**" shall mean the price of the Products set out in Clause 4.1.

"**Seller**" means the party reflected as "Seller" in the Sales Order Confirmation.

"**Owner**" means the registered owner(s), beneficial owner(s) and/or bareboat charterer(s) of the Vessel.

"**Products**" means the marine bunker fuels and related products of whatever type or grade which the Seller is to sell and supply in accordance with the Contract.

"**Supplying Company**" means the Seller's supplier and/or the party delivering the Products physically to the Buyer, including their servants, agents, successors, sub-contractors, and assigns.

"**Supply Vessel**" means the vessel or barge or bunker tanker nominated by the Supplying Company to deliver the Products in accordance with Clause 7.

"**Sales Order Confirmation**" means a confirmation in writing from the Seller to the Buyer setting forth the particular terms of each sale of the Products.

"**Terms and Conditions**" means the standard terms and condition set out in this document in force as of May 2017 and any subsequent revisions and amendments thereto.

"**Vessel**" means the vessel nominated by the Buyer to receive Products.

2.2     Unless the contents otherwise require, any references to the Buyer or Seller shall include their servants, agents or representatives.

2.3     Words importing the singular number may include the plural number, and vice versa. Any references to natural persons shall include a body corporate.

**3.     BASIS OF SALE**

3.1     The Contract for each sale of the Products shall be deemed firm and binding upon the issuance of a Sales Order Confirmation by the Seller. The Sales Order Confirmation may include additional terms and conditions which shall be binding in respect of the particular transaction. Unless expressly set out in the Sales Order Confirmation, no other terms and conditions proposed by the Buyer, whether before or after the Sales Order Confirmation, shall be or become part of the Contract.



**Sing Fuels Pte. Ltd.**                                    **Terms and Conditions**

3.2    The Sales Order Confirmation shall be submitted by Seller by way of fax, telex, electronic communication including but not limited to electronic mail, chat, instant messenger communication or short-messaging service (SMS).

3.3    The Seller shall be entitled to correct any typographical or clerical error and/or omission in any quotation, price list, Sales Order Confirmation, invoice or other document or information issued by the Seller upon notice to the Buyer of the said error and/or omission.

3.4    Both the Buyer and Seller acknowledge that where the supply of the Products under the Contract is made by the Supplying Company, the Supplying Company supplies the Products as an independent contractor and not as an agent or representative of the Seller.

## 4.    PRICE

4.1    The Price shall be the price of the Products exclusive of duties, fees, wharfage dues, taxes and other costs or charges, including but not limited to pipeline charges, charges, dues, duties or taxes imposed by government(s) and/or authorities and barging and delivery charges. The Price shall be as set out in United States Dollars (USD) in the Sales Order Confirmation.

4.2    The duties, fees, wharfage dues, taxes and other costs or charges, including but not limited to pipeline charges, charges, dues, duties or taxes imposed by government(s) and/or authorities and barging and delivery charges, shall be included in the Invoice issued by the Seller to the Buyer and shall be solely borne by the Buyer.

4.3    "**Invoice Price**" is the aggregate of the Price and of all charges, dues, duties or taxes referred to in clauses 4.2, 4.4 and 4.5.

4.4    Any later or additional tax, assessment, duty or other charge of whatever nature and however named, or any additional or increase in costs borne by the Seller caused by any change in the Seller's contemplated source of supply or other change in the cost price of the Products to the Seller, coming into existence after the Contract has been concluded, shall be added to the Invoice Price, provided that the Seller gives the Buyer notice of this within a reasonable time after the Seller becomes aware of the relevant circumstances.

4.5    The Seller also reserves the right to increase the Invoice Price of the Products to reflect any increase in cost to the Seller (including but not limited to any increase in cost due to change in delivery dates, quantities or specifications of the Products as requested by the Buyer, or any delay caused by any instructions of the Buyer or the failure of the Buyer to give the Seller adequate information or instructions), by giving notice to the Buyer in writing on or after the issuance of a Sales Order Confirmation or at any time before delivery of the Products, and the Buyer shall be bound to pay such an increased price.



**Sing Fuels Pte. Ltd.** **Terms and Conditions**

4.6 The Buyer's submission of any complaint or claim under Clause 14 shall not relieve it from its responsibility to make payment in full as required by the Contract, and the Buyer shall not be entitled to deduct from, set off, holdback or otherwise reduce in any manner whatsoever the Invoice Price of the Products or any amount owed to the Seller under the Contract or any other contract between the Seller and the Buyer.

## 5. CHARGES

In addition to the Invoice Price payable for the Products, the Buyer shall pay all lighterage, freight, bunker barge or tanker charges, vehicle, crane, equipment, pipeline charges, wharfage, mooring and unmooring charges, pilotage, port dues, insurance, overtime and clean-up costs in connection with the delivery of the Products under the Contract.

## 6. NOMINATION

6.1 Unless otherwise specified by the Seller, the Buyer shall give the Seller notice in writing at least forty-eight (48) hours prior to delivery (excluding non-business days) of:-

    (a)    The name of the Vessel;

    (b)    The Vessel's local agent(s);

    (c)    The estimated time of arrival;

    (d)    The exact location at which delivery of the Products is required;

    (e)    The grade, quality and exact quantity of the Products required;

    (f)    Any special conditions, difficulties, peculiarities, deficiencies or defects in respect of or particular to the Vessel that might adversely affect the delivery of Products;

    (g)    The maximum allowable pumping rate and pressure for the Vessel; and

    (h)    Any other details as shall be necessary or desirable or required by the Seller.

6.2 With respect to Clause 6.1(f) above, the Buyer shall be responsible for any increased costs and/or expense and/or loss of time incurred by the Seller in connection thereof. If such special conditions, difficulties, peculiarities, deficiencies or defects exist, the Seller may, at its option, cancel the nomination without any liability whatsoever.



**Sing Fuels Pte. Ltd.**                    **Terms and Conditions**

6.3     The Buyer shall reimburse the Seller for overtime and/or other additional expenses incurred due to the failure of the Buyer to provide the Seller with sufficient notice of any changes made to the Buyer's nomination. The Seller shall not be liable for any changes made to the Buyer's nomination less than forty-eight (48) hours prior to delivery, and may at its option cancel the nomination without any liability whatsoever.

6.4     If the Buyer cancels the nomination and/or fails to take delivery of the Products and/or rejects delivery of the Products in part or in full for any reason whatsoever, the Buyer shall be liable for any losses, costs and expenses incurred arising thereby.

**7.     DELIVERY**

7.1     The Seller's obligation to make delivery hereunder is subject to the availability of the Products requested by the Buyer at the port of delivery and the availability of conveyance through the Supplying Company. The Products may be delivered in one consignment or in part lots, and each lot is deemed to represent part of the Contract.

7.2     Delivery of the Products shall be made within the harbour limits or areas stipulated as bunkering areas by the relevant port authorities or governing bodies.

7.3     The Buyer shall make all connections and disconnections between the delivery hose and the intake pipe of the Vessel and shall render all other necessary assistance and provide sufficient equipment to receive all deliveries of the Products hereunder promptly.

7.4     The Buyer shall ensure that the Vessel provides a free, safe and always afloat and accessible side for the delivery of bunkers and that all necessary assistance as required is rendered in connection with the delivery.

7.5     In the event the Supply Vessel is not permitted to deliver the Products to the Vessel, by the relevant terminal or port or yard or jetty authorities or governing bodies, whether pursuant to any rules, regulations, guidelines or circulars, or not, the Seller shall not be liable for any losses whatsoever sustained as a result of any delay and/or failure in delivering the Products.

7.6     If a permit is required from a terminal or port or yard or jetty authority or governing body for deliveries hereunder, no delivery shall be made until the permit has been issued to the Buyer, Seller or Supplying Company, as may be appropriate. The Seller shall not be liable for any losses whatsoever sustained as a result of any delay in obtaining or failure to obtain such permit by the Seller or the Supplying Company, regardless of whether such delay or failure is due to negligence or otherwise.



**Sing Fuels Pte. Ltd.**  **Terms and Conditions**

7.7  Delivery of the Products shall be deemed complete once the Products pass the flange connection between the delivery hose and the Vessel's intake manifold.

7.8  Upon completion of the delivery of the Products to the Vessel, the Master of the Vessel or such other representative of the Buyer shall confirm the delivery by signing the Bunker Delivery Note furnished by the Seller or the Supplying Company if required by the Seller or the Supplying Company.

7.9  The Buyer shall be responsible for any delay caused to the Seller and/or the Supplying Company which is caused by the Buyer, its agents and/or the Vessel, and shall indemnify the Seller for all losses, expenses and/or charges arising out of and in connection with such delay, including but not limited to demurrage or such charges as may be levied by the Supplying Company on the Seller.

7.10  The Seller shall not be responsible for any loss arising from a delay in delivering the Products regardless of the reason for the delay and any guarantee or warranty given expressly or impliedly as to prompt delivery is hereby expressly excluded. The Seller shall also not be responsible for any delay arising from connecting and/or disconnecting the Supply Vessel's delivery hose from the Vessel's intake manifold.

7.11  In the event the Vessel arrives earlier or later than the indicated expected date or arrival, the Seller is under no obligation whatsoever to effect prompt delivery. Any guarantee or warranty given expressly or impliedly as to prompt delivery is hereby expressly excluded.

7.12  For safety reasons, if the Seller or the Supplying Company, in its sole discretion, determines that a clear and safe berth is unavailable or that the environment for delivery of the Products is unsafe, or the general conditions for delivery is unsafe, the Supplying Company and/or Seller may elect not to commence delivery of the Products or to delay or discontinue delivery operations at any delivery or loading location immediately and without any prior notice to the Buyer.

7.13  The Buyer shall be responsible for keeping the Products segregated from any other marine bunker fuels and/or related products of whatever type or grade on board the Vessel or from a different delivery to the Vessel. In no event shall the Seller be responsible for the quality and compatibility of the Products delivered if the Products are mixed or commingled with any other marine bunker fuels and/or related products of whatever type or grade on board the Vessel or from a different delivery to the Vessel. The Buyer shall be solely responsible for any losses caused by mixing or commingling the Products with any other marine bunker fuels and/or related products of whatever type or grade on board the Vessel or from a different delivery to the Vessel, including any damage the Products may cause to the Vessel and/or its components, machinery, equipment and/or appliances.



Sing Fuels Pte. Ltd.                    **Terms and Conditions**

## 8.      QUALITY

8.1     Notwithstanding any information which may be provided by the Seller to the Buyer regarding the characteristics of the Products, the Buyer shall be solely responsible for the selection and acceptance of the Products for use in the Vessel nominated by the Buyer to receive the Products including determination of compatibility with fuel already on board the Vessel.

8.2     The quality of the Products shall be the usual production quality of that grade being sold at the time and place of delivery. **All warranties and conditions, whether express or implied, whether by statute, common law or otherwise as to quality, merchantability, fitness or suitability for any particular purpose, are expressly excluded.**

8.3     The Seller's employees, servants or agents are not authorised to make any representations concerning the Products and its quality(ies), characteristics, description or specifications. In entering into the Contract, the Buyer acknowledges that it has not relied on or will not rely on any such representations.

## 9.      QUANTITY

9.1     The Seller shall be at liberty to supply, and the Buyer shall accept, a variation of 5% from the agreed quantity of the Products as stated in the Sales Order Confirmation, with no consequence other than a corresponding variation to the invoice issued by the Seller.

9.2     The quantity of the Products delivered shall be conclusively determined from the official mass flow meter. If a mass flow meter is unavailable or malfunctioning, the quantity of the products delivered shall be conclusively determined from the gauge or meter of the Supply Vessel effecting delivery. However, in those ports where legal or operational requirements or industry practice dictate that quantities are measured by referencing either shore tank figures or barge loading figures, such measurements shall instead be conclusive. In cases of delivery ex-wharf, shore tank figures shall be conclusive. Quantities calculated from the Vessel's soundings shall not be considered. It is further agreed that any endorsement on any bunker delivery note or the like shall be invalid and be of no effect whatsoever.

9.3     In the event that the quantity of the Products is to be determined from the official mass flow meter and there is a metering stoppage/failure prior to or during the delivery and the delivery cannot be continued, determination of the remaining quantity delivered shall be from the gauge of the Supply Vessel effecting delivery, or the gauge of the shore terminal or wharf in case of ex-wharf delivery. The final quantity delivered shall conclusively be the sum of the said meter and gauge readings recorded. However, if the meter reading for any part of the delivery cannot be immediately obtained/retrieved, the determination of the final quantity delivered shall be solely and conclusively from the gauge of the Supply



**Sing Fuels Pte. Ltd.**                    **Terms and Conditions**

Vessel effecting delivery, or the gauge of the shore terminal or wharf in case of ex-wharf delivery.

9.4     Except where applicable government regulations or port authorities determine otherwise, adjustment in volume owing to difference in temperature shall be made in accordance with API/ASTM-IP Petroleum Measurement Standards for Generalised Products (Table 6B, 24B or 54B).

9.5     For deliveries in Singapore, the quantity shall be measured in accordance with prevailing guidelines set in the Code or its latest edition as of the date of the delivery of the Products under the Contract.

9.6     The Buyer has the right to have its representative or an independent surveyor present during the measurement at its own expense. The Buyer's representative or the independent surveyor shall follow such safety procedures as the Master of the Supply Vessel and/or the Sellers and/or the Terminal may direct and shall, at all times, only use intrinsically safe equipment during the attendance. If the Buyer is not represented, the Seller's determination of quantity delivered shall be deemed correct, conclusive and binding on the Buyer save for fraud or manifest error.

**10.     SAMPLING AND TESTING**

10.1    The Seller and/or the Supplying Company (and/or their representatives) shall arrange for representative samples of the Products to be drawn at the time of delivery of the Products. Unless otherwise agreed between the Buyer and Seller in writing, samples of the Products, for testing, shall be taken from the barge tank or tanks from which the Products is delivered to the Vessel by means of the Tank Composite Method or alternatively, by means of the Drip Method at the Vessel's manifold. For deliveries in Singapore, all samples taken shall be done in accordance to the procedures set out in the applicable Code.

10.2    If there are physical limitations or constraints at the bunker manifold of the Vessel which make custody transfer sampling at that point impossible or impractical, the sampling may be carried out at the bunker manifold of the bunker tanker.

10.3    The Buyer or its representatives may witness the sampling. The Buyer's representative shall follow such safety procedures as the Master of the Supply Vessel and/or the Sellers and/or Terminal may direct and shall at all times only use intrinsically safe equipment during the attendance. The absence of the Buyer or its representatives at the time of sampling shall not prejudice the validity of the samples taken.

10.4    The representative samples taken in accordance with Clause 10.1 or Clause 10.2 above shall be divided and stored in one litre containers, which containers shall be sealed in the



Sing Fuels Pte. Ltd.                    **Terms and Conditions**

presence of the Buyer's representative, signed by both the Seller's and/or the Supplying Company's and the Buyer's representatives.

10.5   The samples shall be distributed as follows: -

(a)    Two samples to the Vessel (one of which is the MARPOL sample);

(b)    One sample retained by the Supply Vessel;

(c)    One sample for bunker surveyor.

(d)    One sample for the testing laboratory, if engaged; and

(e)    The above samples shall be kept for a period of thirty days after delivery, or for such longer period, upon written request and approval by the Buyer and Seller respectively for such an extension.

10.6   These samples shall conclusively represent the quality of the Products supplied to the Vessel. In the event of a claim by the Buyer, the sample(s) in the Seller's or Supplying Company's possession shall be tested and analysed by an independent laboratory, located in the country (and where available, port) of supply, which results shall be conclusive and binding on both the Buyer and Seller, absent fraud or manifest error. The independent laboratory shall be appointed by mutual agreement, and the charges of the independent surveyor and independent laboratory shall be shared equally by the Buyer and the Seller (provided, however, if the resulting analysis does not show any deviations from agreed-upon quality, the fees of the independent surveyor and independent laboratory shall be for the Buyer's account). In the event that the Seller proposes an independent surveyor or independent laboratory, and the Buyer takes no action to either accept this proposal or to suggest an alternative surveyor or laboratory, then the Seller's choice of surveyor or laboratory shall be binding and any tests performed by the independent laboratory shall be similarly binding, regardless of whether or not the Buyer chooses to send a representative to witness the testing.

10.7   Any samples drawn by the Buyer's personnel either at the time of bunkering or at any date after bunkering shall not be valid as an indicator of the quality of the Products supplied. The fact that such samples may bear the signature of personnel aboard the delivery conveyance shall have no legal significance as these personnel have no authority to bind the Seller to different contractual terms.

10.8   It is the duty of the Buyer to take all reasonable actions to eliminate or minimize any damages or costs associated with any off-specification or suspected off-specification Products. To this end, the Buyer shall cooperate with Seller in achieving the most cost



**Sing Fuels Pte. Ltd.**                    **Terms and Conditions**

effective solution, including the consumption of the Products after treatment, blending, special handling and/or de-bunkering.

## 11.    RISK AND TITLE

11.1    Risk in the Products shall pass to the Buyer once the Products pass the flange connection between the delivery hose and the Vessel's intake manifold.

11.2    The title and property in the Products delivered shall remain with the Seller and shall not pass to the Buyer until such time as the Buyer shall have paid to the Seller all sums due under the Contract. Without derogation from clause 7.13, if the Products supplied under the Contract are admixed or co-mingled with other fuels of the Buyer and/or any person other than the Buyer, the product thereof shall become, or shall be deemed to be owned in common by the Seller with the Buyer and/or such other person(s).

11.3    Until title and property passes to the Buyer in accordance with Clause 11.2, the Buyer shall hold the Products as bailee of the Seller and shall not consume, use, resell, deal with or dispose of the Products or allow the consumption or use of the Products. Until that time, the Buyer shall store the Products in such a way that it can be identified as the Seller's property and shall keep it separate from the Buyer's own property and the property of any other person.

## 12.    LIEN

12.1    Deliveries and loading of the Products hereunder are made not only on the credit of the Buyer but also on the faith and credit of the Vessel and the Buyer agrees and warrants that the Seller will have and may assert a maritime lien against such Vessel in respect of all claims arising under the Contract and may take such other action or procedure against the Vessel and any other vessel or asset beneficially owned or controlled by the Buyer for any amounts due under any Contract including all interest and costs that may be payable. No acceptance of any other or additional security measures by the Seller shall operate as a waiver of this provision.

12.2    The Seller is entitled to rely on any provisions of law of the flag state of the Vessel, the place of delivery or where the Vessel is found and shall, among other things, enjoy the full benefit of local legislation granting the Seller a maritime lien on the Vessel and/or providing for the right to arrest the Vessel. Nothing in the Contract shall be construed to limit the rights and/or legal remedies that the Seller may enjoy against the Vessel or the Buyer in any jurisdiction.

12.3    The Seller shall not be bound by any restriction, limitation or prohibition on its entitlement to a maritime lien on the receiving Vessel. In particular, any notice or any stamp in the



**Sing Fuels Pte. Ltd.**                    **Terms and Conditions**

bunker delivery receipt or similar shall be invalid and cannot waive the Seller's maritime lien on the Vessel.

## 13.    PAYMENT

13.1    The Seller shall be entitled to invoice the Buyer for the Invoice Price of the Products delivered to the Vessel and for any other charges referred to in Clauses 4 and 5 above on or at any time after delivery of the Products, or in the event the Buyer fails to take delivery or accept the Products, at any time after such refusal is communicated to the Seller.

13.2    The Buyer shall within the time stipulated by the Seller in the Contract or in the absence of such provision or in the event the Buyer wrongfully refuses to take delivery, make full payment forthwith in United States Dollars (USD) without any discount or deduction whatsoever for or on account of any taxes, levies, duties, charges, fees, withholdings, discounts, set offs, counterclaims, restrictions or conditions of any nature and notwithstanding any claims of whatsoever nature and howsoever arising, by telegraphic transfer in immediately available funds to the Seller's bank account with account details as provided in the invoice or in the absence of such provision to:

> Bank Name          :          OCBC Bank
> Branch               :          Singapore
> Account Number   :          503-141525-301

> or as otherwise as instructed by the Seller.

13.3    Payment shall only be deemed to be made when the said transfer is unconditionally cleared and confirmed by the Seller's bank within the period stated herein. In the event payment falls on any day other than a business day or any other day on which the Seller's bank is closed, payment shall be made on or before the business day immediately preceding the day on which payment would apart from this Clause have fallen due.

13.4    In the event of failure by the Buyer to make payment on the due date of any sums due under the Contract, without prejudice to any other rights or remedies available to the Seller, the Seller shall additionally be entitled to:-

(a)    Stop and/or suspend any further deliveries to the Buyer under the Contract and/or any other contracts between the parties hereto;

(b)    Charge interest at the rate of twenty four percent per annum (24% p.a.) (or part thereof) on all outstanding sums, until receipt of unconditionally cleared funds in full by the Seller's bank, which the Buyer accepts is a reasonable pre-estimate of



**Sing Fuels Pte. Ltd.**                     **Terms and Conditions**

the loss that would be suffered by the Seller in the event of the Buyer's default in payment, or alternatively the maximum rate of interest permitted by the applicable law; and

(c)     The right to set-off any sums owed to the Buyer from any sums due and owing by the Seller to the Buyer under the Contract  and under any other contracts or arrangements.

13.5    The Buyer shall be liable to the Seller for any legal costs and/or expenses incurred in collecting the sums due and outstanding under the Contract, whether or not proceedings are commenced against the Buyer. If the Seller commences legal proceedings against the Buyer, the Buyer shall indemnify the Seller for all losses, costs and expenses arising out of and in connection with the proceedings.

## 14.     CLAIMS

14.1    Save for claims pertaining to quantity (which is covered in Clause 14.2 below), any claims arising out of or in connection with the Contract shall be notified to the Seller within seven (7) days from the date of delivery of the Products, in writing, together with all supporting documents and all necessary details required by the Seller to satisfactorily evaluate the claim. Failing which, the delivery by the Seller of the Products in the Contract shall be deemed to be fulfilled and the Seller shall be discharged from all liability whatsoever in respect of the Products, notwithstanding any remarks or clauses noted on any bunker delivery note or other document. Following the lapse of the seven (7) days as aforesaid, any claim against the Seller for any reason whatsoever shall be deemed waived.

14.2    Any claim by the Buyer as to shortage in quantity of Products supplied (other than as per Clause 9.1 above) must be notified by telephone as well as in writing by the Buyer or the Master of the Vessel to the Seller immediately when the dispute occurs and while the delivery hoses are still connected. Failing which, the Seller's determination of the quantity of the Products supplied pursuant to Clause 9 above shall be final, conclusive and binding on the Buyer save for manifest fraud or error.

14.3    Upon receiving the notification of the complaint regarding the quantity of Products supplied in accordance with Clause 14.2, if the Buyer and Seller cannot resolve differences, the Buyer shall immediately and before the Vessel sails, appoint an independent surveyor approved by the Seller to determine the quantity of Products delivered from the Supply Vessel. A Certificate of Quantity issued by such surveyor shall be conclusive and binding on both the Buyer and Seller save for manifest fraud or error.  Should the independent surveyor's determination of the quantity fall within the accepted tolerance of 5% as stated Clause 9.1, the costs for the analysis of the independent surveyor shall be borne by the Buyer. Should the independent surveyor's determination of quantity fall outside the



**Sing Fuels Pte. Ltd.** **Terms and Conditions**

tolerance of 5% as aforesaid, the costs for the analysis of the independent surveyor shall be borne by the Seller.

14.4 For any claim as to the quality of the Products delivered, the Buyer shall base its claim solely on an analysis of the sample retained by the Vessel in accordance with Clause 10.5 at the time of the delivery, together with a complete set of supporting documentation, which includes but is not limited to the documents in clause 14.6(a); however such analysis shall not be considered determinative of the claim. One (1) of the two (2) remaining samples in Clause 10.5 shall be submitted for analysis to a mutually agreed independent laboratory. The analysis by the independent laboratory shall be conclusive and binding, absent manifest error or fraud, as to the quality of the Products delivered. The analysis shall be established by tests in accordance with ISO 8217 and/or any other specifications agreed between the Buyer and Seller in writing. Unless otherwise agreed, should the independent laboratory's analysis confirm that on-specification fuel has been delivered the expenses of engaging the independent laboratory shall be borne by the Buyer. Should the analysis confirm that off-specification fuel has been delivered, the expenses of engaging the independent laboratory shall be borne by the Seller. Any cost associated with the Buyer appointing a representative to witness the sample seal-breaking and/or analysis at the independent laboratory shall be the sole responsibility of Buyer.

14.5 The Code (save for the Singapore Bunker Claims Procedure) shall apply to the extent that it is not inconsistent with these Terms and Conditions herein.

14.6 In the event any claim is presented in accordance with Clause 14, the Buyer shall:

(a) Present the Seller or its representatives with an investigation report in respect of its claim, including but not limited to information and documents from the Buyer or its representatives for the Seller or its representatives to investigate such claim, including but not limited to the boarding and inspection of the Vessel, interviewing of crew and/or the review and copying of the Vessel's records, log books, engine logs, etc.;

(b) Take all reasonable steps and actions to mitigate any damages, losses, costs and/or expenses related to any claim of alleged off-specification or defective Products. If the Products deviate from specifications, the Buyer shall use all reasonable endeavours to mitigate the consequences thereof including the employment of purification tools and/or other similar measures; and

(c) Take all reasonable steps to preserve the Seller's recourse against the Supplying Company of the Products or any culpable third party.



**Sing Fuels Pte. Ltd.**                    **Terms and Conditions**

14.7    Without derogation from the provisions in Clause 14, any claims against the Seller in respect of the Contract shall be brought before the relevant court or arbitral tribunal within six (6) months of the date of delivery of the Products, failing which any such claim shall be deemed to be waived and absolutely time-barred.

14.8    The Buyer's submission of any claim does not relieve it of the responsibility to make full payments as required under Clause 13 and the Buyer shall not be entitled to set off any amounts owing from the Buyer to the Seller under the Contract.

## 15.    DEFAULT

15.1    Each of the following events, regardless of whether the occurrence of which is within the control of the Buyer, shall be an Event of Default:

(a)    **Non-Payment**: if the Buyer fails to pay to the Seller any amount whatsoever due arising out of or in connection with the Contract or any other contract between the parties on its due date;

(b)    **Failure to Accept Delivery:** if the Buyer, for whatever reason, fails to accept the Products in part or in full at the place and time designated for delivery.

(c)    **Breach of Obligations**: if the Buyer commits or threatens to commit a breach of or does not perform or comply with any of the terms and conditions contained in this Contract or any other contract between the Buyer and Seller;

(d)    **Inability to Perform**: if, before the date of delivery, the Seller is of the opinion that the Buyer is at risk of or may be unable to perform its obligations under the Contract, due to its financial position or for any other reason;

(e)    **Insolvency**:

i.    If the Buyer is or becomes insolvent or is unable to pay its debts as they fall due;

ii.    If the Buyer makes any voluntarily arrangement with its creditors or becomes subject to an administration order or (being an individual or firm) becomes bankrupt or (being a company) goes into liquidation, otherwise than for the purposes of amalgamation or reconstruction;

iii.    If a receiver, liquidator, trustee, administrator, judicial manager or similar functionary of the Buyer is appointed over all or a substantial part of the Buyer's assets, other than for the purpose of a merger or an amalgamation);



Sing Fuels Pte. Ltd.                    **Terms and Conditions**

     iv.     Liquidation, bankruptcy or any other change in the financial or legal position of the parent company, sister companies or affiliated companies of the Buyer, which in the sole discretion of the Seller is deemed to adversely affect the financial position of the Buyer;

(f)    **Enforcement Proceedings**: if an encumbrancer takes possession of any property or assets of the Buyer;

(g)    **Cessation of Business:** if the Buyer ceases, or threatens to cease, to carry on business;

(h)    **Others:** if the Seller is reasonably of the opinion that any of the events mentioned above is about to occur, or if any act is done or event occurs which, under the applicable law thereof, has a substantially similar effect to any of the said acts or events described above.

15.2    Upon the occurrence of an Event of Default, whether or not the Event of Default is continuing, the Seller may at its sole discretion, by notice in writing to the Buyer, declare that all further deliveries under the Contract are suspended or cancelled, whereupon any other contracts between the Buyer and the Seller shall automatically be cancelled and forthwith cease, and the Seller shall be entitled to demand immediate payment and discharge of all of the sums payable under the Contract or any other contracts between the Buyer and the Seller (which shall become so due and payable immediately).

## 16.    CANCELLATION

In addition to and without prejudice to the Seller's rights and remedies under Clause 15 above:

16.1    No order for the Products shall be cancelled by the Buyer except with the express agreement in writing of the Seller. In the event of any cancellation, the Buyer shall indemnify the Seller in full against all loss (including loss of profit), costs (including the costs of all services rendered and labour and materials used) damages, charges and expenses incurred by the Seller as a result of cancellation.

16.2    Where the Products are to be delivered by a Supply Vessel, the Seller shall be entitled at its option, without any formal proof of loss, to be paid damages for barging costs at the rate of minimum USD Four Dollars and fifty cents (USD 4.50) per metric tonne of the Products which would have delivered but for such cancellation.



**Sing Fuels Pte. Ltd.**                               **Terms and Conditions**

16.3    The Seller reserves the right to cancel the Contract at any time if the Vessel fails to present itself for supply or the Vessel is not ready to accept delivery of the Products for more than 72 hours after the nominated date and time of supply, or the Vessel is unable to or refuses to accept the quantity of Products ordered pursuant to the Contract, and which cancellation shall not prejudice the Seller's rights under Clauses 16.1 and 16.2 above.

## 17.   FORCE MAJEURE

17.1    The Seller shall not be liable for any claim, loss and/or damage of whatsoever nature and howsoever arising in the event that the performance under the Contract is prevented, delayed, or made substantially more expensive as a result of any one or more of the following contingencies, whether or not such contingency may have been foreseen or foreseeable at the time of contracting and regardless of whether such contingency is direct or indirect ("**Force Majeure Event**"):

   (a)    Compliance with the relevant laws and/or regulations of any jurisdiction which the Seller and/or the Supply Vessel and/or her operator may be subjected to, or a change, request or order of any governmental authority or agent;

   (b)    Shortage in raw material, transportation, manufacturing, or fuels from the Seller's contemplated source of supply howsoever arising;

   (c)    Any other cause beyond the reasonable control of the Seller, whether or not foreseeable, including but not limited to labour disputes, lock outs, strikes, industrial actions, governmental intervention, the Seller's response to the insistence or request of any governmental body or person purporting to act therefor, war, invasion, act of foreign enemy, hostilities, (whether war has been declared or not), civil war, revolution, insurrection, civil commotion, any breakdown in machinery or power failure, breakdown of or damage to machinery, fire, flood, accident, storm or any act of God, legislation, rules, acts, restrictions, regulations, bye laws, orders, requisitions, prohibitions or measures of any kind on the part of any governmental or duly constituted authority, import or export regulations, or embargoes; or

   (d)    Any determination, at the Seller's sole discretion, that proceeding with a delivery would be a violation of relevant laws and/or regulations of any jurisdiction to which Seller may be subjected to.

17.2    In the event that performance is prevented or delayed by a Force Majeure Event, the Seller may stop or reduce deliveries in any manner as it may determine in its sole discretion.

17.3    If performance is made substantially more expensive by a Force Majeure Event or there is otherwise a material increase in price after the conclusion of the Contract (i.e. whether by



**Sing Fuels Pte. Ltd.**                      **Terms and Conditions**

reason of the Force Majeure Event or not), the Seller shall have the option either to reduce or stop deliveries or to continue deliveries and, subject to Clause 14, increase the Invoice Price in a fair proportion to the increased cost.

## 18.     INDEMNITY AND LIMITATION OF LIABILITY

**Indemnities**

18.1    The Buyer shall indemnify the Seller against and hold the Seller harmless from:-

   (a)     all and any losses, liabilities, claims, penalties, damages, costs and expenses whatsoever and howsoever incurred whether directly or indirectly caused by or in connection with or arising out of the loading, receiving, using, storing, transporting of the Products delivered hereunder, any breach of the Contract by the Buyer;

   (b)     any act or omission, negligence or misconduct or default of the Buyer, its agents, employees, contractors or persons acting under its authority and/or the officers and crew of the Vessel; or

   (c)     any failure of the Buyer or the Vessel's local agent to provide the Seller with prior sufficient notice or of any changes in the information or any cancellation and/or variations to the nominations referred to Clause 6 and/or the failure of the Vessel to present itself for delivery.

18.2    Without derogation from clause 7.13, the Seller shall not be liable for any claim where there is or has been co-mingling of the Products supplied by the Seller with fuel or petroleum products on board the Vessel. Any loss of or damage to the Products, or to any property of Seller and/or the Supplying Company or to any other person, during or after loading caused by the Buyer and/or its agents, employees, contractors, persons acting under its authority and/or the Vessel and/or her officers or crew shall be fully borne by the Buyer and the Buyer shall to such extent indemnify or reimburse the Seller for the same.

18.3    The Seller is not responsible for any damage caused by or to the Supply Vessel arising from any contact and/or collision and/or swell and/or other weather or sea related condition or incident. If, however, any of the involved parties (including but not limited to the Vessel and/or Supply Vessel interests) pursue the Seller by way of legal proceedings or otherwise, the Buyer shall, on demand, fully indemnify and hold the Seller harmless in respect of any liability, loss, damage or expense of whatsoever nature in this connection.



**Sing Fuels Pte. Ltd.**                    **Terms and Conditions**

**Exclusion and limitation of liabilities**

18.4    The Buyer agrees that the Seller shall not be liable to the Buyer by reason of any representation, or any implied warranty, condition or other term, or any duty at common law, or under the express terms of the Contract, for any direct, indirect, special or consequential loss or damage including but not limited to damage to the Vessel and/or her equipment, machinery and/or appliances, loss of profits or business, loss in goodwill, costs, expenses, fines, liabilities or other claims for compensation and/or indemnity whatsoever (whether caused by the negligence or wilful neglect of the Seller or the Supplying Company, their employees or agents or otherwise) which arise out of or is in connection with the supply of the Products or their use, including any disputes as to quantity or quality of the Products, late or non-delivery of the Products, regardless of whether this was due to unavailability, congestion at loading terminal or anchorage or prior commitment of the Seller or the Supplying Company, the Seller's or the Supplying Company's performance or failure to perform this Contract for any reason whatsoever.

18.5    If Clause 18.4 is held to be invalid or unenforceable by any law or regulation of any government or by any court or arbitral tribunal and the Seller is liable to the Buyer under the Contract, the liability of the Seller, whether caused by negligence or not and whether based in tort or contract or any other cause of action whatsoever, shall not exceed 5% of the Price of the Products (in accordance with Clause 4.1) supplied pursuant to the Contract.

18.6    For the avoidance of doubt, nothing herein shall derogate from Clauses 13 and 14.8.

**19.    ENVIRONMENTAL PROTECTION**

19.1    It shall be the sole responsibility of the Buyer to ensure that the Vessel, its crew and those responsible for its operation and management observe and comply with all health, safety and environment laws and regulations with regard to the receipt, handling and use of the Products. The Buyer warrants that the Vessel is in compliance with all national and international trading and pollution regulations.

19.2    The Buyer warrants that:

(a)    The Vessel will be properly manned, equipped, maintained and operated so as to avoid leakage, spillage, overflow, water or land pollution.

(b)    The Buyer and the Vessel's personnel shall exercise due diligence to prevent oil pollution.

(c)    The Vessel shall at all material times be fully insured with a reputable Protection and Indemnity Club.



**Sing Fuels Pte. Ltd.**                    **Terms and Conditions**

(d)     The Buyer is familiar with the health effects related to Products supplied hereunder and with relevant protective safety and health procedures for the handling and use of such Products. The Buyer shall adhere to such safety and health procedures while using or handling Products. The Buyer shall also facilitate the dissemination of health and safety information to all employees, users, and others potentially exposed to Products sold hereunder. The Buyer shall be responsible for compliance by its employees, agents or contractors, and other users with all health and safety requirements or recommendations related to Products supplied hereunder and shall exert its best efforts to assure that any of its employees or agents, users, and others avoid frequent or prolonged contact with or exposure to Products both during and subsequent to delivery. The Seller or Supplying Company accepts no responsibility for any consequence arising from failure by the Buyer, its employees, agents, contractors, any users, or any other party to comply with relevant health and safety requirements or recommendations relating to such contact or exposure.

19.3    The Seller or the Supplying Company has the right to refuse to deliver the Products to the Vessel if, in its sole discretion, it decides that such delivery will result in adverse consequences of any kind whatsoever to the environment.

19.4    If in the course of any delivery under a Contract there is any escape, spillage, or discharge of the Products, the Buyer shall promptly take and shall assist and co-operate with Seller and the Supplying Company in taking any necessary action to remedy or mitigate the consequence thereof, which shall always be conducted in accordance with such local laws and regulations which may compulsorily apply. Notwithstanding the cause of such escape, spillage or discharge, the Seller or Supplying Company may at its option, upon notice to the Buyer or their local agents, take such measures, either in co-operation with the Buyer or by itself, and incur such expenses (whether by employing its own resources or by contracting with others) as are reasonably necessary in the judgment of the Seller or the Supplying Company to remove the oil and mitigate the effects of such escape, spillage or discharge. If the Seller or Supplying Company exercises such option, the Buyer shall co-operate and render such assistance as may be required by the Seller or Supplying Company (as the case may be).

19.5    Any expense, damage, cost, fine or penalty arising from any escape, spillage, discharge or pollution of oil shall be paid by the party (either the Seller, Supplying Company or the Buyer) causing the same by a negligent act or omission. If both parties are at fault (by way of negligence or otherwise), any expenses shall be divided between the parties in accordance with the respective degrees of fault.

19.6    The Buyer shall give or cause to be given to the Seller and Supplying Company all such documents and other information concerning any escape, spillage or discharge or any



Sing Fuels Pte. Ltd.                    **Terms and Conditions**

programme for the prevention thereof, which are requested by the Seller or Supplying Company or as required by law or regulation applicable at the time and place where the Seller delivers the Products to the Buyer.

## 20.   AGENTS

20.1   The Buyer, if not the Owner, expressly warrants that he has the full authority of the Owner to act on its behalf in entering into this Contract and has the authority of the Owner to contract on the Owner's personal credit and on the credit of the Vessel.

20.2   The Buyer further warrants that it is authorised to order the Products for and on behalf of the Owners and the Vessel, and also warrants that the Seller has a lien on the Vessel for any supplies made under the Contract. If the party ordering the Products is not the Owner, the Buyer shall be solely and fully responsible for communicating the terms and conditions of the Contract to the Owner and shall obtain the Owners' agreement of the same and the Buyer shall do so before the time of delivery of the Products.

## 21.   ASSIGNMENT

21.1   These Terms and Conditions shall be binding upon and inure to the benefit of the parties hereto and their successors and the Buyer may not, without the Seller's written consent, assign any of its rights or obligations under the Contract, in whole or in part, to any party.

21.2   In the event that payment of the Invoice Price is not received in full by the Seller in accordance with Clause 13, the Buyer agrees to assign and does hereby assign all rights and remedies to which it is entitled under any contract of sale or supply or delivery which it may enter with the Vessel, the Owner, charterer, manager, operator and/or trader and/or any other party whatsoever, pursuant to which it re-sells or otherwise delivers or supplies the Products sold by the Seller (or any part thereof), whether commingled with fuel sold or supplied by other parties or otherwise ("**Assigned Interests**").

21.3   The Buyer irrevocably authorises or consents to the Seller giving of any notice of assignment on the Buyer's behalf or otherwise, and commencing and continuing of any and all legal proceedings or arbitrations (including any action in rem) in the Buyer's name or jointly in the names of the Seller and Buyer for the recovery of such Assigned Interests, and the Buyer irrevocably consents to have itself named as the plaintiff/claimant or co-plaintiff/co-claimant in such action and hereby authorises the Seller to take all steps taken in connection with the commencement and continuation of such actions, including but not limited to the appointment of lawyers. The Buyer shall use its best endeavours to assist and cooperate with the Seller to enable the Seller to recover the Assigned Interests, including but not limited to the provision of evidence, securing the attendance and cooperation of



**Sing Fuels Pte. Ltd.**                    **Terms and Conditions**

witnesses and execution of documents. The Seller shall have the sole right to retain for itself any money and/or benefit recovered from a third party pursuant to this Clause.

21.4    Any claim brought against a third party under Clause 21 shall be in addition to and entirely without prejudice to any rights, claims or remedies the Seller may have against the Buyer, the Vessel and/or any other parties.

## 22.    NOTICES

22.1    Notices hereunder shall be sent by letter, email or facsimile to the Seller at:

**Sing Fuels Pte Ltd**
Fax      :        +65 6222 4414
Email   :        operations@singfuels.com

or such subsequent address, email or facsimile as may be notified by the Seller to the Buyer, from time to time.

22.2    Notices to the Buyer may be made by the Seller, or by any person or firm for the time being acts as solicitor for the Seller, by letter, email, facsimile transmission to the Buyer's last business address, email or facsimile number known to the Seller, and every demand or notice so made or given shall be deemed to have been made or served:

(a)        Where the demand or notice was sent by email or facsimile transmission, on the day such demand or notice was sent.

(b)        Where the demand or notice was sent by post, two (2) days after being posted notwithstanding the fact the letter may be returned to through the post office undelivered.

22.3    Any written notice sent at any time outside the normal working hours of the Seller shall be deemed to be received on the working day following the day the written notice was sent.

## 23.    GOVERNING LAW AND JURISDICTION

23.1    Without derogation from Clause 23.7, the Contract shall be governed by and construed in accordance with the laws of Singapore.

23.2    Any dispute arising out of or in connection with the Contract, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration in Singapore in accordance with the Arbitration Rules of the Singapore Chamber of Maritime Arbitration ("**SCMA**") in force at the commencement of the



**Sing Fuels Pte. Ltd.**                    **Terms and Conditions**

arbitration, which rules are deemed to be incorporated by reference in this Clause (the "**SCMA Rules**"). The Seller may however, at its sole option, commence proceedings against the Buyer in any other jurisdiction. Any submission to the Singapore jurisdiction or arbitration shall not prejudice or restrict the Seller's rights to commence proceedings in any jurisdiction, in particular, in the jurisdiction where the Vessel is located at any point in time for the purposes of obtaining security.

23.3     A party wishing to refer a dispute to arbitration shall serve on the other party a written Notice of Arbitration in accordance with the SCMA Rules. The reference shall be to a sole arbitrator, who shall be appointed by the Chairman of SCMA.

23.4     Nothing in this Clause shall prejudice the parties' rights to seek injunctive relief or preservative relief or security in aid of arbitration from any relevant courts in any jurisdiction.

23.5     The Buyer and Seller hereby irrevocably waives actual personal service of process in connection with any action initiated in any court or tribunal to whose jurisdiction the Parties have submitted, and agrees to accept, in lieu of personal service, written notice of such action, given by hand or by certified or registered pre-paid mail or by electronic communication (such as electronic mail), to its address as set out in these Terms and Conditions or otherwise notified pursuant to the Contract, or to its principal place of business, and addressed to the party in question, provided that either party may cause service of process to be effected in any other lawful manner rather than by use of the aforesaid procedure.

23.6     The United Nations Convention on Contracts for the International Sale of Goods 1980 shall not apply to this Contract.

23.7     Notwithstanding the Clauses above, the Seller is free to bring a suit in any jurisdiction and shall be entitled to avail itself of all remedies under maritime or other law to obtain jurisdiction and/or security for its claims against Buyer, its agents or affiliates, the Vessel, the Owners and charterers and any of their respective agents, servants or assigns, including but not limited to vessel arrest and attachment procedures, similar laws, rules or statutes in any jurisdiction. Further, the Seller may apply and benefit from any law in any jurisdiction which grants the Seller a maritime lien and/or right to arrest the Vessel and the parties' rights and remedies under the Contract shall at the Seller's election be resolved by that law to the exclusion of Singapore law.

**24.     GENERAL**

24.1     A person who is not a party to the Contract has no right under the Contracts (Rights of Third Parties) Act and any subsequent amendment thereto to enforce any term of the Contract.



**Sing Fuels Pte. Ltd.**                       **Terms and Conditions**

24.2    Nothing stated herein or under a Sales Order Confirmation is intended to create a partnership, franchise, joint venture, agency, or a fiduciary or employment relationship. Neither party may bind the other party or act in a manner which expresses or implies a relationship other than that of independent contractor.

24.3    If any provision hereof is held invalid by any law or regulation of any government or by any court or arbitrator, such invalidity will not affect the enforceability of other provisions.

24.4    Rights and obligations under each Contract which by their nature should survive will remain in effect after termination or expiration of the relevant Contract.

24.5    Subject to the Terms and Conditions, no failure or delay by the Seller in exercising any right or remedy provided under the Contract against the Buyer shall constitute a waiver of such right or remedy, nor shall it preclude or restrict the further exercise of such or any other right or remedy. No single or partial exercise of such right or remedy by the Seller or the Supplying Company shall preclude or restrict the further exercise of such or any other right or remedy by the Seller or the Supplying Company as the case may be.

24.6    No modification to the terms of a Contract will be binding, unless in writing and signed by an authorized representative of each party.

24.7    A party receiving confidential information (the "**Recipient**") must keep it confidential using the same degree of care that it exercises with respect to its own information of like importance but in no event less than reasonable care, and may use it only for the purposes for which it was provided under the Contract. Such confidential information may be disclosed only to employees, contractors and third party providers performing services in furtherance of this Contract and/or each party's internal activities, that are obligated to the Recipient under similar confidentiality restrictions and only for the purposes for which it was provided under the Contract. These obligations do not apply to information which:

(a)     is rightfully obtained by the Recipient without breach of any obligation to maintain its confidentiality;

(b)     is or becomes known to the public through no act or omission of the Recipient;

(c)     the Recipient develops independently without using any confidential information of the other party; or

(d)     is disclosed in response to a valid court or governmental order, if the Recipient has given the other party prior written notice and provides reasonable assistance so as to afford it the opportunity to object.