**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division**

FILED

APR 2 0 2021

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**SING FUELS PtE. Ltd.,**
    **Plaintiff,**

            v.

**M/V LILA SHANGHAI (IMO 9541318)
her engines, freights, apparel,
appurtenances, tackle, etc., in rem,**

            **Defendant.**

**CIVIL ACTION NO. 4:20-cv-58
IN ADMIRALTY**

### *MEMORANDUM OPINION AND ORDER*

Before the Court is Plaintiff Sing Fuels Pte. Ltd.'s ("Sing Fuels" or "Plaintiff") claim

alleging a maritime lien against the Defendant, M/V LILA SHANGHAI, in rem, ("the Vessel" or

"Defendant"), and for an entry of judgment in its favor in the amount of $532,312.48, plus arrest

costs in the amount of $6,790.44, pre and post judgment interest, and taxable costs. ECF No. 1.

On February 23, 2021, the Court held a one-day bench trial. The Court, having heard the

arguments, read the submissions of counsel, considered the evidence including court-room

testimony and exhibits, and based on the following findings of fact and conclusions of law enters

judgement for the Defendant.

### I.   PROCEDURAL HISTORY

On April 22, 2020, Plaintiff filed a Complaint seeking to arrest the M/V LILA SHANGHAI

(the "Vessel"), pursuant to Supplemental Admiralty Rule C to enforce a maritime lien for the

supply of necessaries in accordance with the Commercial Instrument and Maritime Lien Act

("CIMLA"), 46 U.S.C. § 31301, *et seq*. ECF Nos. 1, 3, 6. On April 28, 2020, the Owner of the

Vessel, Autumn Harvest Maritime Co. ("Autumn Harvest"), through its Protection & Indemnity

Club, posted a Letter of Undertaking to serve as substitute security and stand in the place of the arrested Vessel. ECF Nos. 11, 12. On February 5, 2021, the parties agreed to certain stipulated facts and agreed trial exhibits in advance of trial. ECF No. 31. After the one-day trial held on February 23, 2021, the Court ordered parties to submit post trial briefs within thirty (30) days. ECF No. 41.

## II.   JURISDICTION AND STANDING

The Court has subject matter jurisdiction based upon admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333. An in-rem action against a vessel for assessment of a fine or penalty is within admiralty jurisdiction, as is a proceeding for forfeiture of property seized on the high seas or navigable waters for violation of federal law. 28 U.S.C.A. § 1333; 23 Fed. Proc., L. Ed. § 53:8. This case is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for breach of a maritime contract. Defining the admiralty jurisdiction of the United States is a matter of federal law. *See United States v. Utah*, 283 U.S. 64, at 75 (1931); *United States v. Holt State Bank*, 270 U.S. 49, at 55-56, (1926); *see also*, *United States v. White's Ferry Inc., Ferryboat Gen. Jubal Early*, 382 F. Supp. 162, at 165 (D. Md. 1974). The Supreme Court long ago held that "[j]urisdiction …, [a]s applied to a suit in rem for the breach of a maritime contract, it presupposes- First that the contract sued upon is a maritime contract; and second, that the property proceeded against is within the lawful custody of the court. These are the only requirements necessary to give jurisdiction. Proper cognizance of the parties and subject-matter being conceded, all other matters belong to the merits…. [T]he question of lien or no lien is not one of jurisdiction, but of merits." *World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co.,* 783 F.3d 507, 512 (4th Cir. 2015) (citing *The Resolute,* 168 U.S. 437, at 439-440(1897).

Here, Plaintiff is suing Defendant for an alleged breach in a maritime contract for the bunker fuel. *See* ECF No. 1; *see also, Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 24 (2004) (stating that whether a contract is a "maritime contract," "depends upon the nature and character of the contract, and the true criterion is whether it has reference to maritime service or maritime transactions" (internal quotation marks and alteration omitted)). According to the Complaint, Plaintiff was and still is a foreign corporation registered in Singapore. ECF No. 1 at ¶ 4. Moreover, at the time the complaint was filed, Defendant, a 43692 gross tonnage bulk carrier, was or was soon be within the Eastern District of Virginia. See *In re Millenium Seacarriers, Inc.*, 419 F.3d 83, 94 (2d Cir.2005) ("[S]ubject matter jurisdiction lies in the district court where the vessel or other res is located, but that jurisdiction does not attach until the vessel is arrested within the jurisdiction."). Thus, Defendant is subject to the jurisdiction and venue of the Court. *Id.* at ¶ 5.

### III.   STIPULATED FACTS

On February 5, 2021, the parties agreed to the following stipulated facts. ECF No. 31.

1. Plaintiff is a foreign corporation registered in Singapore with an address of 10 Anson Road, #16-09 International Plaza, Singapore 079903. Sing Fuels is, among other things, in the business of buying and selling marine fuel and gas oil, commonly known as "bunkers."

2. Plaintiff Sing Fuels also maintains offices at locations around the world, including an office in Athens, Greece.

3. Defendant in rem, M/V LILA SHANGHAI (hereinafter the "Vessel"), is a 43692 gross tonnage bulk carrier, built in 2011, with IMO No. 9541318 and International Call Sign of A8WC5.

4. Claimant Autumn Harvest is the owner of the Vessel.

5.  The Vessel was chartered by Autumn Harvest to Bostomar Bulk Shipping Pte. Ltd. for the period of April 25, 2019 to December 31, 2019.

6.  On July 10, 2019, 595.888 metric tons of 380 centistokes (cst) bunker fuel was delivered to the Vessel at or near Port Elizabeth, South Africa.

7.  On July 12, 2019, 459.038 metric tons of 380 cst bunker fuel was delivered to the Vessel at or near Port Elizabeth, South Africa.

8.  In total, 1049.29 metric tons of 380 cst bunker fuel (the "Bunker Fuel") was delivered to and accepted by the Vessel while at anchorage at or near Port Elizabeth, South Africa.

9.  The Vessel was redelivered to Bostomar Bulk Shipping Pte. Ltd. on August 12, 2019.

10. The Vessel consumed the Bunker Fuel.

## IV.   THE COURT'S FINDINGS OF FACT

1.  Autumn Harvest time chartered the vessel to Bostomar Bulk Shipping, PTE from April 25, 2019 to December 31, 2019. A time charter is controlled by the terms of a contract known as a charter party.

2.  Bostomar Bulk Shipping subchartered the Vessel to Medmar Inc. Providenciales Turks & Caicos Islands, BWI ("MedMar Inc.").

3.  The Charter Party contract contained several provisions. Line 16 of the charter party stated that "Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for the fulfillment of this Charter Party." Ex. 13 at 1. Line 39 provides "that whilst on hire the Charterers shall provide and pay for all the fuel except as otherwise agreed…" *Id.* at 2. Line 77 provides that the Vessel's "Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers . . ." *Id.* at 3. Moreover, line 86 provides that Charterers will "furnish the Captain

from time to time with all requisite instructions and sailing directions." *Id.* at 4. Clause 9 provides "In no event shall Charterers procure, or permit to be procured, for the Vessel, any supplies/services on the credit of the Vessel or her Owners." *Id.* at p. 32. The Charter Party provides that "Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel." *Id.* at Ln. 111, p. 5. The Charter Party also calls for arbitration of any dispute between the Owner (Autumn Harvest) and the Charterer (Bostomar) in Singapore. *Id.* at Ln. 107, pg. 5

4. Sing Fuels never reviewed the Charter Party agreement to verify the Owner and Charter entities and verify it was dealing with the actual subcharterer rather than an affiliate. Rasmussen 30(b)(6) Depo. at 34:14-23. The Sales Confirmation issued by Sing Fuels only states "MedMar Inc" without any other identifying details. Ex. 2 at 1.

5. Sing Fuels was contacted by Mr. Costas Mylonakis to order fuel for the Vessel. Rasmussen 30(b)(6) Depo. at 26:10-14. Mr. Mylonakis is an employee or agent of a company called Windrose Marine. *Id.* at 25:19-26:1. Sing Fuels dealt exclusively with Mr. Mylonakis for this transaction. *Id.* at 26:10-14. Sing Fuels never saw or reviewed any documentation establishing any agency relationship between Windrose and MedMar Inc. *Id.* at 26:15-17. Sing Fuels never communicated with MedMar Inc. directly. *Id.* at 26:5-9. Sing Fuels later learned that Mr. Mylonakis was also not communicating directly with MedMar, but, rather, was exclusively communicating with an entity called M.A.C. Shipping. *Id.* at 27:14-19.

6. After the bunker fuel order, a Sales Order Confirmation was sent electronically to Mr. Mylonakis. Ex. 2 at 1. The Sales Confirmation twice states that it is pursuant to "General Terms and Conditions of Bunker Fuel." Ex. 2 at 2 ¶ 6. No document entitled "General Terms

and Conditions of Sale of Bunker Fuel" has ever been produced or identified in this case. Instead a document entitled "Terms and Conditions of Sale for Marine Fuels 2017" has been put forward by Sing Fuels. *See* Ex. 3 at 1. The Sales Confirmation also claimed the right for Sing Fuels to "amend the terms and conditions at any time without prior notice to buyer." *Id.* The Sales Confirmation further provided that it was "for charterer's account unless such particular knowledge is specifically brought to our attention and our written consent is obtained." *Id.* at ¶ 7.

7. The Terms and Conditions specifically provides that "Seller reserves the right to, at its sole discretion, revise and amend the Terms and Conditions herein from time to time and without notice." *Id.* at ¶ 1.2. Moreover, paragraph 14.7 states that the buyer must bring any claims against Sing Fuels within six months.

8. Autumn Harvest never received the Terms and Conditions. Rasmussen 30(b)(6) Depo. at 35:14-24.

9. During the order of the bunker fuels, Sing Fuels had the ability to contact the owner of Defendant Vessel, Autumn Harvest. Rasmussen 30(b)(6) Depo. at 15:1-5. However, Sing Fuels never communicated with Autumn Harvest during its investigation period. During the inquiry period, Sing Fuels investigated MedMar Inc. and determined that they had low assets but still decided to extend a $1.6 million credit line. Tr. 51:24-52:12. Sing Fuels provided MedMar Inc. with 60 days to pay the amount owed after the fuel was delivered to the Vessel. Tr. 19:9-11; Tr. 52:17-19.

10. The initial bunker contract with MedMar was completed in May 2019 for a fuel delivery worth approximately $300,000. Tr. 20:13-19. The fuel was successfully delivered, received by the Vessel, and MedMar Inc. paid Sing Fuels for the bunkers. Tr. 20:23-24; Tr. 63:16-

64:6. Then, Sing Fuels and MedMar reached an agreement on June 28, 2019 for the supply of 950 – 1050 metric tons of bunkers to the Vessel to occur on or about July 5-6, 2019, at the Outer Port Limits of Port Elizabeth, South Africa. On July 10, 2019 and July 12, 2019, a total of 1049.29 metric tons of 380 cst bunker fuel was delivered to and accepted by the Vessel while at anchorage at Port Elizabeth, South Africa. Trial Ex. 4; Tr. 55:14-19. By October 2019, MedMar Inc. did not pay the amount owed.

11. After MedMar Inc defaulted in October 2019, Sing Fuels started to track the Vessel on a regular basis and identified that it was in the United Kingdom and India. Tr. 58:25-59:11; Tr. 70:4-6. Sing Fuels had opportunities to arrest the Vessel at various ports before it arrived in the United States. Tr. 59: 12-15. Sing Fuels elected not to arrest the Vessel at other ports. Tr. 59:22-25. Sing Fuels received notice from the owners of the Vessel, Autumn Harvest, that they were not paying for the fuel. Tr. 60: 9-25. Sing Fuels knew that it had a maritime lien on the Vessel at the time of delivery in July 2019 when there was no payment and that they could arrest the Vessel as early as October. Tr. 61:1-20. In February 2020, Plaintiff met with the Vessel's owners who clarified again that they were not going to pay for the bunker fuel. Tr. 62: 1-22. After the meeting, Sing Fuels had another opportunity to arrest the Vessel in Dubai, but Plaintiff did not.

## V. CONCLUSIONS OF LAW

### A. Choice-Of-Law Provision

1. The Supreme Court set forth several factors for federal courts sitting in admiralty to consider in determining what country's law governs: "(1) the place of the wrongful act; (2) the law of the flag; (3) the allegiance of the injured party; (4) the allegiance of the defendant shipowner; (5) the place of contract; (6) the inaccessibility of a foreign forum; and (7) the law of the

forum." *Trans–Tec Asia v. M/V HARMONY CONTAINER,* 518 F.3d 1120, 1124 (9th Cir.2008) (citing *Lauritzen v. Larsen,* 345 U.S. 571, at 583–92 (1953).

2. "In the absence of a contractual choice-of-law clause, federal courts sitting in admiralty apply federal maritime choice-of-law principles derived from the Supreme Court's decision in *Lauritzen* and its progeny." *Chan v. Soc'y Expeditions, Inc.,* 123 F.3d 1287, 1296 (9th Cir.1997).

3. Where the parties have specified in their contract which law should apply to their transaction, however, "admiralty courts will generally give effect to that choice." *Hawkspere Shipping Co. v. Intamex, S.A.,* 330 F.3d 225, 233 (4th Cir. 2003) (quoting *Chan,* 123 F.3d at 1297).

4. It is well established under federal maritime law that absent a compelling reason of public policy, a freely negotiated choice-of-law clause in a maritime contract should be enforced. *See M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12–13 (1972) ("There are compelling reasons why a freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power … should be given full effect."); *Lauritzen,* 345 U.S. at 588–89 (1953) ("Except as forbidden by some public policy, the tendency of the law is to apply in contract matters the law which the parties intended to apply."); *Bominflot, Inc. v. M/V HENRICH S,* 465 F.3d 144, 148 (4th Cir. 2006) ("Because no 'other law' is specified on the face of the contract, and public policy does not counsel against it, we will respect the parties' intentions and apply English law."); *see also, Triton Marine Fuels Ltd., S.A. v. M/V PACIFIC CHUKOTKA*, 575 F.3d 409, 413 (4th Cir. 2009).

5. If a foreign choice of law does not differ in any material respect from the corresponding principles of United States law, the Court "need not resolve the choice-of-law question, as it makes no discernible difference to the relevant analysis in the case at bar." *World Fuel Servs.*

8

*Trading, DMCC v. Hebei Prince Shipping Co.,* 783 F.3d 507, 514–15 (4th Cir. 2015); *see also, Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 838 n. 20, (1985) (Stevens, J., concurring in part and dissenting in part) ("If the laws of both states relevant to the set of facts are the same, or would produce the same decision in the lawsuit, there is no real conflict between them." (quotation marks and citation omitted)); *Hammersmith v. TIG Ins. Co.,* 480 F.3d 220, 230 (3d Cir. 2007) (stating that a conflict of law analysis is unnecessary if the laws of each jurisdiction are the same, or would lead to the same result, because there is no "conflict" in the law that needs to be resolved); *Okmyansky v. Herbalife Int'l of Am., Inc.,* 415 F.3d 154, 158 (1st Cir. 2005) ("[W]hen resolution of a choice-of-law determination would not alter the disposition of a legal question, a reviewing court need not decide which body of law controls."); *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.,* 414 F.3d 325, 331 (2d Cir.2005) ("[W]e [do] not have occasion to embark on a choice-of-law analysis in the absence of an actual conflict between the applicable rules of two relevant jurisdictions."); *Cruz v. Am. Airlines, Inc.,* 356 F.3d 320, 331–32 (D.C. Cir. 2004) (same); *Modern Equip. Co. v. Cont'l W. Ins. Co.,* 355 F.3d 1125, 1128 n. 7 (8th Cir. 2004) (same); *Schneider Nat'l Transp. v. Ford Motor Co.,* 280 F.3d 532, 536 (5th Cir.2002) (same).

**B. Laches and Maritime Liens**

1. The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit"), has held that "[l]aches is an equitable doctrine that can be raised by a defendant as an affirmative defense to a claim, and requires that the defendant show '(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'" *Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. Dann Ocean Towing, Inc.,* 756 F.3d 314, 318 (4th Cir. 2014). (citing *Giddens v. Isbrandtsen Co.,* 355 F.2d 125, 127 (4th Cir.

1966)). In assessing the timeliness of a maritime claim, the doctrine of laches typically applies rather than any fixed statute of limitations. *See Giddens* at 126–27.

2. However, the Fourth Circuit has stated that "an otherwise valid choice-of-law provision in a maritime contract is enforceable and may require application of a jurisdiction's statute of limitations, in lieu of the doctrine of laches, to govern issues regarding the timeliness of claims asserted under that agreement." *See Am. Steamship Owners* at 315; *see also, McGowan v. Pierside Boatworks, Inc.*, No. 2:16-CV-3529-PMD, 2017 WL 698370, at *2 (D.S.C. Feb. 22, 2017). There are many examples of exceptions to the general rule of laches, such as statutory provisions that impose time bars on personal injury actions arising out of maritime torts, *see* 46 U.S.C. § 30106, on certain cargo loss contract claims under the Carriage of Goods by Sea Act, *see* 49 Stat. 1207, 1209 (1936) (codified at 46 U.S.C. § 30701 note), and on maritime salvage actions, *see* 46 U.S.C. § 80107(c).

3. "As a general rule, in deciding whether maritime claims are barred by laches, courts of admiralty may review local limitations as rules-of-thumb concerning the presence of prejudice or excusable delay." *See Conty v. States Marine Lines, Inc.*, 355 F.2d 26, 27–28 (2d Cir. 1966) (citing *Oroz v. American President Lines*, 259 F.2d 636, 639 (2d Cir. 1958); *see also*, Gilmore & Black, The Law of Admiralty, 628 (1957); *see also*, *Czaplicki v. The Hoegh Silvercloud*, 351 U.S. 525, 533 (1956). While the Court does not have to strictly apply the state statute of limitations, it may use it as a guidepost. *See Hill v. W. Bruns & Co.*, 498 F.2d 565, 568 (2d Cir.1974) ("In an admiralty suit state statute of limitations are not strictly applied.").

4. The Commonwealth of Virginia has a six-month limitation on the filing of liens after repairs of real property that is most analogous to the instant case. *See* Va. Code Ann. § 43-17.[1] This six-month limitation starts to run at the point when the debt becomes payable which "refers to the time when the obligation to pay is immediate, after which the debt is past due, interest runs and action may be brought." *S. Materials Co. v. Marks*, 196 Va. 295, 297 (1954) (citing *Dungan v. Henderlite*, 62 Va. (21 gratt.) 149; 70 C.J.S., payable, p. 202). The Fourth Circuit has also adopted the rule that a maritime lien "'is created by operation of law 'from the moment the debt arises.'" *Addax Energy SA v. M/V Yasa H. Mulla*, No. 18-2438, 2021 U.S. App. LEXIS 1828, at *10-11 (4th Cir. Jan. 22, 2021) (quoting *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv., Ltd.*, 982 F.2d 765, 766 (2d Cir. 1992).

5. Additionally, "where a maritime lien is to be enforced to detriment of purchaser for value, without notice of the lien, defense of laches will be held valid under shorter time, and more rigid scrutiny of circumstances of the delay, than when claimant is owner at the time lien accrues." *Phelps v. The Cecelia Ann*, 199 F.2d 627 (4th Cir. 1952).

6. "[A] district court may not mechanically apply the local statute of limitations as equity eschews mechanical rules; it depends on flexibility." *DeSilvio v. Prudential Lines, Inc.,* 701 F.2d 13, 15 (2d Cir.1983) (internal citations and quotations omitted). The "well established" factors for a court to consider include "whether there existed satisfactory excuse for the delay in bringing the cause of action and whether allowing the action to go forward despite the delay would unfairly prejudice the defendant. These questions are to be evaluated in light of

---

[1] Pursuant to Va. Code Ann. § 43-17, "no suit to enforce any lien perfected under §§ 43-4, 43-5 and 43-7 to 43-10 shall be brought after six months from the time when the memorandum of lien was recorded or after sixty days from the time the building, structure or railroad was completed or the work thereon otherwise terminated, whichever time shall last occur; provided, however, that the filing of a petition to enforce any such lien in any suit wherein such petition may be properly filed shall be regarded as the institution of a suit under this section; and, provided further, that nothing herein shall extend the time within which such lien may be perfected."

the 'peculiar equitable circumstances' of the case." *Bradesco Seguros, S.A. v. PPG Indus., Inc.*, No. 06 CIV.0115 DC, 2007 WL 592025, at *2 (S.D.N.Y. Feb. 27, 2007), *clarified on denial of reconsideration*, No. 06 CIV. 0115 (DC), 2007 WL 895243 (S.D.N.Y. Mar. 20, 2007) (citing *Id.* (internal citations and quotations omitted)); *see Eazor Express, Inc. v. United States*, 483 F.Supp. 138, 141 (E.D.N.Y. 1980).

7. Although the Court may use the six-month statute of limitations as a guidepost, the Court must carefully consider the "peculiar equitable circumstances" of the instant case to determine whether the Defendant's laches defense is meritorious. *See Bradesco Seguros*.

## C. Maritime Liens and Actual or Apparent Authority

1. Pursuant to 46 U.S.C.A. § 31341, the following persons are presumed to have authority to procure necessaries for a vessel:

> (1) the owner;
> (2) the master;
> (3) a person entrusted with the management of the vessel at the port of supply; or
> (4) an officer or agent appointed by—
>> (A) the owner;
>> (B) a charterer;
>> (C) an owner pro hac vice; or
>> (D) an agreed buyer in possession of the vessel.
> (b) A person tortiously or unlawfully in possession or charge of a vessel has no authority to procure necessaries for the vessel.

2. The party claiming a maritime lien must demonstrate that it did so "on the order of the owner or a person authorized by the owner." 46 U.S.C. § 31342.[2] "It has long been the maritime law that the owners of a vessel are not personally liable for goods or services furnished to the vessel on order of a bare boat charterer of the vessel." *Pierside Terminal Operators, Inc. v.*

---

[2] Pursuant to 46 USCA § 31342:
(a) Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner--
(1) has a maritime lien on the vessel;
(2) may bring a civil action in rem to enforce the lien; and
(3) is not required to allege or prove in the action that credit was given to the vessel.
(b) This section does not apply to a public vessel.

*M/V Floridian*, 389 F. Supp. 25, 25–26 (E.D. Va. 1974) (citing *The U.S.* 219, 21 F.Supp. 463 (E.D.Pa. 1937); *The Lizzie Burt*, 16 F.Supp. 67 (D.Del. 1936).).

3.  Generally, "the supplier of 'necessaries' shall be entitled to a lien on the vessel to which the 'necessaries' are furnished." *Int'l Terminal Operating Co. v. S. S. Valmas*, 375 F.2d 586, 588 (4th Cir. 1967). However, "[i]f inspection of a charter party would have shown that the charter had no authority to bind the ship, a supplier of 'necessaries'" is charged by section 973 with knowledge of the provisions of the charter party forbidding the creation of a lien." *Id.*

4.  Additionally, it is well-established that "agency can be established, under United States law, only by evidence of overt acts on the part of the principal that would indicate an agency relationship; the subjective beliefs of the persons dealing with the alleged agent are thus irrelevant to the inquiry." *Hawkspere Shipping Co. v. Intamex*, S.A., 330 F.3d 225, 235 (4th Cir. 2003); *see also, Auvil v. Grafton Homes, Inc.*, 92 F.3d 226, 230 (4th Cir. 1996) ("From the well-established tenet that an agent cannot create his own authority to represent a principal it follows that an agent's statements that he has such authority cannot, without more, entitle a third party to rely on his agency.") (internal citations omitted).

## VI.   DISCUSSION

### A.  Choice-of-Law

In the instant case, the Court finds it unnecessary to conduct a *Lauritzen* choice-of-law analysis because the contract at issue contains a choice-of-law provision. *See Triton Marine*, 575 F.3d at 413; *see also Lauritzen*, 345 U.S. at 588–89, 73 S.Ct. 921 ("Except as forbidden by some public policy, the tendency of the law is to apply in contract matters the law which the parties intended to apply."). It is well established under federal maritime law that a strong showing that it should be set aside, the parties' choice of law provision, as part of a

"freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power ... should be given full effect." *M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 12–13 (1972); *see, e.g., Bominflot, Inc. v. M/V HENRICH S,* 465 F.3d 144, 148 (4th Cir.2006) ("Because no 'other law' is specified on the face of the contract, and public policy does not counsel against it, we will respect the parties' intentions and apply English law."). At the same time, the Fourth Circuit has only recognized choice-of-law provisions in bunker fuel supply contracts when a specific jurisdiction is expressly and explicitly identified in the contract. *Id.*; *World Fuel Servs. Trading v. Hebei Prince Shipping Co.,* 783 F.3d 507, 514 (4th Cir. 2015). For example, in *Bominflot Inc. v. M/V Henrich S,* there was no dispute that the parties had agreed that English law should apply. 465 F.3d 144, 148 (4th Cir. 2006). Similarly, both parties agreed in *Triton Marine Fuels Ltd., S.A. v. M/V Pac. Chukotka,* 575 F.3d 409, 413 (4th Cir. 2009) that "United States maritime law governs whether the choice-of-law provision is enforceable."

In this case, there is a dispute as to whether Singaporean or U.S. law applies to the contract. Before the Court determines which law pertains, the Court must examine the validity of the choice-of-law provision at bar. *See Trans-Tec Asia v. M/V Harmony Container,* 518 F.3d 1120, 1124 (9th Cir. 2008) ("we cannot rely on the choice of law provision until we have decided, as a matter of law, that such a provision was a valid contractual term and was legitimately incorporated into the parties' contract."); *Siegelman v. Cunard White Star,* 221 F.2d 189, 195 (2d Cir. 1955) ("there is much doubt that parties can stipulate the law by which the validity of their contract is to be judged"); *De Nicola v. Cunard Line, Ltd.,* 642 F.2d 5, 7 n.2 (1st Cir. 1981); *John T. Jones Constr. Co. v. Hoot Gen. Constr. Co.,* 613 F.3d 778, 782-83 (8th Cir.

2010) ("the choice-of-law provision can have no effect until the court determines the validity of the contract itself").

The "General Terms and Conditions of Bunker Fuel" contains a choice-of-law provision which states that "[T]he Contract shall be governed by and construed in accordance with the laws of Singapore." Ex. 3, ¶ 23.1; *see also,* Ex. 2. Under controlling Fourth Circuit precedent, this type of provision would apply and bind the owner of a vessel in a bunker supply contract. *See Triton Marine Fuels* at 413 (4th Cir. 2009). However, ¶ 23.1 begins with a clause that the neutral choice of law is "[w]ithout derogation from Clause 23.7." Ex. 3 at ¶ 23.1. Clause 23.7 provides in full part:

> Notwithstanding the Clauses above, the Seller is free to bring a suit *in any jurisdiction* and shall be entitled to avail itself of all remedies under maritime or other law to obtain jurisdiction and/or security for its claims against Buyer, its agents or affiliates, the Vessel, the Owners and charterers and any of their respective agents, servants or assigns, including but not limited to vessel arrest and attachment procedures, similar laws, rules or statutes in any jurisdiction. Further, the *Seller may apply and benefit from any law in any jurisdiction which grants the Seller a maritime lien and/or right to arrest the Vessel and the parties'* rights and remedies under the Contract shall at the Seller's election be resolved by that law to the exclusion of Singapore law.

Ex. 3 at ¶ 23.7 (emphasis added). Thus, Plaintiff's contract contains a floating choice-of-law provision because it allows the Seller to bring a maritime lien claim in *any* jurisdiction. In addition, the Terms and Conditions also provide another governing law provision that states:

> The Seller is entitled to rely on any provisions of law of the flag state of the Vessel, the place of delivery or where the Vessel is found and shall, among other things, enjoy the full benefit of local legislation granting the Seller a maritime lien on the Vessel and/or providing for the right to arrest the Vessel. *Nothing in the Contract shall be construed to limit the rights and/or legal remedies that the Seller may enjoy against the Vessel or the Buyer in any jurisdiction.*

Ex. 3 at ¶ 12.2 (emphasis added). Accordingly, when Clauses 23.1, 23.7, and 12.2 are read together, it appears that Singapore law applies, except with regards to maritime liens, in which

case Sing Fuels "may apply and benefit from any law in any jurisdiction which grants the Seller a maritime lien and/or right to arrest the Vessel" including the local law, the vessel's flag state, the law of the place of delivery, Singapore law, or the law of any other jurisdiction.

Defendant argues that Plaintiff's floating choice-of-law provision in the bunker fuels contract violates public policy considerations because Sing Fuels can require application of the law of "any jurisdiction which grants the Seller a maritime lien." *See* Trial. Ex. 3 at ¶ 23.7. Elsewhere in the contract, Sing Fuels declares that it is "*not bound by any restriction, limitation, or prohibition on its entitlement to a maritime lien on the receiving Vessel.*" Ex. 3 at ¶ 12.3. (emphasis added). Defendant argues that the floating provision would adversely affect the interests of Defendant, as the Vessel owner, because it was not a party to the contract containing the choice-of-law provision between MedMar Inc. and Plaintiff. Accordingly, Defendant argues that such contractual provisions have been held to be "unreasonable and unjust" or "overreaching." *See* ECF No. 34 at 10-13.

In this case, Plaintiff's floating choice-of-law allowed Plaintiff to bring a maritime suit in the United States and avoid Singaporean law, where there is no maritime lien for necessaries. *See, e.g. World Fuel Servs. Sing., PTE v. M/V Bulk Juliana*, No. 13-5421, 2014 U.S. Dist. LEXIS 81530, at *6 (E.D. La. June 16, 2014 ("Singapore law, modeled after English law, does not provide a maritime lien for necessaries."); *see also, Sembawang Shipyard, Ltd. v. Charger, Inc.*, 955 F.2d 983, 988 (5th Cir. 1992) (holding that, unlike U.S. law, maritime liens are not authorized by Singapore law). As detailed below in Section VI.C, Plaintiff admitted that it knew that it could establish a maritime lien on the Vessel at the time of delivery when there was no payment and that they could have arrested the Vessel in "any number of ports" between October 2019 and February 2020. Tr. 59:8-15; Tr. 59:3-7; Tr. 61:1-20. Yet, Sing Fuels elected not to

arrest the Vessel in other ports based on their discussions with their lawyers. Tr. 59:22-25. Accordingly, pursuant to Clause 23.7 of the Terms and Conditions, Sing Fuels used the floating choice-of-law provision to benefit from U.S. jurisdiction to obtain a maritime lien and the right to arrest the Vessel "…to the exclusion of Singapore law." *See* Ex. 3 at ¶ 23.7.

Although the Fourth Circuit has previously enforced choice-of-law provisions which "adversely affects the interests of—and works a fundamental unfairness against—a vessel owner who was not party to the contract containing the choice-of-law provision," the Fourth Circuit has neither recognized nor stricken floating choice-of-law provisions. *World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co.*, 783 F.3d 507, 514, n.3 (4th Cir. 2015) (citing *Triton Marine*, 575 F.3d at 413–16). Specifically, in *Triton Marine*, the Fourth Circuit considered a bunker fuel contract that contained a provision that the "agreement shall be governed and construed in all particulars by the laws of the United States of America, and the parties hereby agree to the jurisdiction of the United States District Courts." *Id.* at 412. The Fourth Circuit, relying on the Fifth and Ninth Circuit, held that although the vessel was under charter and its owner was not a party to the agreement, the choice-of-law provision requiring application of U.S. law was enforceable in fuel supplier's in rem action against vessel under the Federal Maritime Lien Act (FMLA). *See Triton Marine at* 414 (4th Cir. 2009); *see also, Liverpool & London S.S. Protection & Indemnity Association v. QUEEN OF LEMAN MV*, 296 F.3d 350, at 353 (5th Cir.2002) (upholding a maritime lien asserted by an English insurer against a vessel for unpaid insurance premiums where the insurance contract provided that it was to be governed by English law and also provided that the insurer could "enforce its right of lien in any jurisdiction in accordance with local law in such jurisdiction."); *see id* at 354 ("there is nothing absurd about applying the law of the jurisdiction into which the ship sails, as the ship's presence in the

jurisdiction represents a substantial contact."); *see also, Trans-Tec Asia v. M/V HARMONY CONTAINER*, 518 F.3d 1120, at 1126 (9th Cir.), *cert. denied*, 555 U.S. 1062 (2008). Later, the Fourth Circuit Court reaffirmed its *Triton Marine* holding by enforcing a choice-of-law provision in *World Fuel Servs. Trading v. Hebei Prince Shipping Co.*, 783 F.3d 507, 520 (4th Cir. 2015) (enforcing a provision that the "General Terms and each Transaction shall be governed by the General Maritime Law of the United States. . .").

Later in *Bominflot, Inc. v. M/V Henrich S*, Fourth Circuit explicitly refused to rule as to "what the result would have been in this case had Bominflot's contract qualified its choice-of-law provision with a provision reserving 'its right of lien in *any* jurisdiction in accordance with local law.'" *Id.* (emphasis added). 465 F.3d 144, 150 n.10 (4th Cir. 2006). Thus, while the Fourth Circuit has clearly upheld choice-of-law provisions that specifically name the jurisdiction, the Fourth Circuit has not upheld or stricken down floating choice-of-law provisions. Accordingly, the Court need not determine whether the floating choice-of-law provision is unreasonable and overreaching at this case.

In this case, neither application of United States law nor Singaporean law would result in any fundamental unfairness to Defendant, as the owner of the Vessel. First, when Clauses 23.1, 23.7, and 12.2 are read together, the subcharter and Plaintiff agreed to have their transaction governed by the vessel's flag state, the law of the place of delivery, Singapore law, or the law of any other jurisdiction. Ex. 3. Where the parties have specified in their contract which law should apply to their transaction, however, "admiralty courts will generally give effect to that choice." *Hawkspere Shipping Co. v. Intamex, S.A.*, 330 F.3d 225, 233 (4th Cir. 2003) (internal quotations omitted). Nor would enforcement of this provision create unnecessary uncertainty or violate public policy considerations in maritime dealings because "freely negotiated contract

terms encourages predictability and certainty in the realm of international maritime transactions." *Trans–Tec,* 518 F.3d at 1131.

Second, Defendant is not subject to any more prejudice than it would have been had the subcharterer elected to receive necessaries while in a United States port, whereby a maritime lien unquestionably would have arisen by operation of United States law. If a foreign choice of law does not differ in any material respect from the corresponding principles of United States law, the Court "need not resolve the choice-of-law question, as it makes no discernible difference to the relevant analysis in the case at bar." *World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co.,* 783 F.3d 507, 514–15 (4th Cir. 2015). Critically, the application of Singaporean or United States law both lead to the same outcome in favor of the Defendant.

## B. The Plaintiff had no Contract with the Defendant or its Agent.

The Court finds that there is no privity of contract between the Defendant owner of the Vessel and Plaintiff. Specifically, the subcharterer, MedMar Inc., did not have actual, apparent, or presumed authority to hold the Defendant liable for the bunker fuel.

The party claiming a maritime lien must demonstrate that it did so "on the order of the owner or a person authorized by the owner." 46 U.S.C. § 31342. In making this determination, the Court will examine the relationship between the Defendant, as owner of the Vessel, the charterer, and the subcharterer to determine the scope of liability.

1. There was No Actual Authority to Create a Maritime Lien on the Vessel

That Court finds that based on the charter party, Defendant explicitly stated that the subcharter, MedMar Inc., did not have actual authority to order necessary supplies that would create a maritime lien on the Vessel. Autumn Harvest chartered the vessel to Bostomar Bulk Shipping, PTE from April 25, 2019 to December 31, 2019. A time charter is controlled by the

19

terms of a contract known as a charter party. The Charter Party contract contained several provisions. First, line 16 of the charter party stated that "Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for the fulfillment of this Charter Party." Ex. 13 at 1. Furthermore, line 39 provides "that whilst on hire the Charterers shall provide and pay for all the fuel except as otherwise agreed…" *Id.* at 2. Line 77 provides that the Vessel's "Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers . . ." *Id.* at 3. Moreover, line 86 provides that Charterers will "furnish the Captain from time to time with all requisite instructions and sailing directions." *Id.* at 4.

Most critically, clause 9 provides that *"[i]n no event shall* Charterers procure, or permit to be procured, for the Vessel, any supplies/services *on the credit of the Vessel or her Owners." Id.* at 32 (emphasis added). The Charter Party also provides that "Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel." *Id.* at Ln. 111, p. 5.

The Court finds that Sing Fuels never reviewed a time charter because Sing Fuels' representative never asked for copies of the charter parties. Tr. 35:24-36:2. Sing Fuels ignored the charter party even though it knew that charter parties could contain such no-lien language. Tr. 36:9-12, 37:3-5. Although Sing Fuels had the ability to contact the Defendant, Sing Fuels never communicated with Autumn Harvest. *See* Rasmussen 30(b)(6) Depo. at 15:1-5.

Therefore, the Court finds that the charter party agreement between Defendant and Bostomar, Inc. explicitly states that, while Bostomar could subcharter the Vessel to MedMar Inc., the subcharterer (MedMar Inc.) could not procure any supplies, including fuel, on the credit of the Vessel or the Defendant.

2.   There was No Presumed Authority to Create a Maritime Lien on the Vessel

In response, Plaintiff alleges that it relied on representations of Mr. Costas Mylonakis, a fuel broker, that he was the agent of MedMar Inc. At trial, Sing Fuels argued that there were certain acts that led them to believe that Mr. Mylonakis was the agent of MedMar. Thus, Sing Fuels argues that Mr. Mylonakis had apparent or presumed authority to establish a maritime lien on the Vessel.

In response, Defendant argues that there were no overt acts of Defendant Autumn Harvest that established that MedMar Inc. had apparent or presumed authority to establish a maritime lien on the Vessel. *See Hawkspere Shipping Co. v. Intamex*, S.A., 330 F.3d 225, 235 (4th Cir. 2003) ("agency can be established, under United States law, only by evidence of overt acts on the part of the principal that would indicate an agency relationship; the subjective beliefs of the persons dealing with the alleged agent are thus irrelevant to the inquiry."). Defendant further alleges that it does not matter that Sing Fuels believed that MedMar was an agent for the Defendant or that Mr. Mylonakis made representations that MedMar Inc. was the agent for the Defendant. *See Auvil v. Grafton Homes, Inc.*, 92 F.3d 226, 230 (4th Cir. 1996) ("From the well-established tenet that an agent cannot create his own authority to represent a principal it follows that an agent's statements that he has such authority cannot, without more, entitle a third party to rely on his agency.").

The following evidence supports the Court's conclusion that Mr. Mylonakis, the fuel broker, was not the agent for MedMar Inc., and, thus, could not establish the maritime line on behalf of Plaintiff. First, to establish apparent authority, Plaintiff argues that MedMar paid for a previous fuel invoice in May 2019 for the Vessel. However, Mr. Ulrich Rasmussen, Sing Fuels' Vice President of Credit Risk, undercut Sing Fuels' argument when he admitted that Sing Fuels had

no idea who had actually paid these invoices. Tr. 69:17-20. Second, rather than obtain information about the charter party, Sing Fuels only spoke with Mr. Mylonakis, the fuel broker, and relied solely on its interactions with him. Tr. 41:14-19. Accordingly, Plaintiff did not provide evidence to show that Mr. Mylonakis was an agent of neither Autumn Harvest (the owner), Bostomar (the charterer), nor MedMar (the subcharterer). To that contrary, the evidence at trial demonstrated that Sing Fuels only communicated with Mr. Mylonakis, the fuel broker. Tr. 49:2-11. That is, Sing Fuels had no documentation to indicate that Mr. Mylonakis was the agent for MedMar. Tr. 40:25-43:8. There was no communication by Sing Fuels with anyone at MedMar regarding these bunkers. Tr. 43:20-22. And, finally, MedMar had no communication indicating that Mr. Mylonakis was its agent. Tr. 43:3-8.

Second, Sing Fuels argues that Mr. Mylonakis provided documents suggesting that MedMar was going to order bunkers in Port Elizabeth. Thus, Plaintiff argues that the Court should conclude that Mr. Mylonakis was MedMar's agent since he ordered bunker fuels in Port Elizabeth. However, Mr. Mylonakis revealed later that he never had direct communications with MedMar Inc. regarding these fuel bunkers. Critically, Sing Fuels admitted that it never dealt directly with MedMar Inc. and always had several intermediaries in the relevant transaction, including at least a company called "Windrose Marine" and another called "M.A.C. Shipping." Rasmussen 30(b)(6) Depo. at 27:25-29:2. Mr. Mylonakis revealed he was only dealing with M.A.C. Shipping and that *he believed* they were the same entity as MedMar Inc. Nevertheless, Sing Fuels did not confirm the relationship between M.A.C. Shipping and MedMar Inc. Tr. 47:2-48:3. After Sing Fuels requested to meet, MedMar refused which Mr. Rasmussen said was surprising. Tr. 48:4-17. Thus, the Court finds this evidence is entirely consistent with the conclusion that Mr. Mylonakis ordered the bunkers for M.A.C. Shipping, not MedMar Inc, and

that M.A.C. Shipping was acting on its own to find a subcontractor like Sing Fuels without ever involving MedMar. Furthermore, nothing in the record suggests that M.A.C. Shipping is the same company as MedMar Inc. *Cf. World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co.,* 783 F.3d 507, 516 (4th Cir. 2015) (holding that although the broker ordered fuel for a vessel with a different name, "[a]ll the record evidence points to the same conclusion: 'WFS Trading DMCC' is 'World Fuel Services Trading, DMCC,' and 'WFS is simply an acronym for 'World Fuel Services' rather than a formal designation of a separate entity.). Accordingly, Sing Fuels never dealt with any charterer or charter's agent connected to the Defendant, the owner of the Vessel. Rather, the record only shows that Plaintiff solely dealt with Mr. Mylonakis, a fuel broker who was not dealing directly with MedMar Inc. Tr. 47:2-48:6. Sing Fuels' unfounded reliance on Mr. Mylonakis' agency cannot meet the requirements of presumed authority under 46 USCS § 31341.

Although the record does show a tenuous relationship between Mr. Mylonakis, the fuel broker, and MedMar Inc. the Fourth Circuit has not gone so far as to hold that a fuel broker with no direct relation to the vessel could establish a lien. *But see, Tramp Oil and Marine, Ltd. v. M/V "Mermaid I",* 805 F.2d 42, at 46 (1st Cir.1986) (holding that a British fuel broker, which had no direct relation to the vessel itself, was not entitled to a "suppliers' lien" under the FMLA, as it was not a "supplier."); *Trinidad Foundry & Fabricating, Ltd. v. M/V K.A.S. Camilla,* 966 F.2d 613, at 617 (11th Cir.1992) (holding that "§ 31342 does not provide for a maritime lien for goods and services supplied by a foreign plaintiff to foreign flag vessels in foreign ports."); *Swedish Telecom Radio v. M/V Discovery I,* 712 F.Supp. 1542, 1548 (S.D.Fla.1989) (stating that the FMLA "was not intended to provide maritime liens for goods and services where ... they are supplied by foreign companies in foreign ports"). In *Triton Marine,* the Fourth Circuit

distinguished *Tramp Oil* and *Trinidad,* by holding that in cases where there are a significant number of ties between the United States and the transaction at issue, an American fuel broker or supplier can place a maritime lien. *Triton Marine Fuels,* at 418. Although, the Fourth Circuit left the question unanswered as to whether a foreign fuel broker with tenuous ties to the Vessel can establish a maritime lien, the Fourth Circuit *Triton Marine Fuels* holding requires that Plaintiff at least show a connection from the supplier to the Vessel.

Here, there is evidence supporting Defendant's argument that Mr. Mylonakis was not the agent of MedMar Inc and, thus, that Sing Fuels does not have a direct connection to the Vessel. Although this case involves an *in rem* action asserting a maritime lien against the Vessel, rather than an *in personam* claim against Defendant as the Vessel's owner, *see Triton Marine Fuels,* 575 F.3d at 413, Plaintiff has not established that the fuel broker had a direct contact with the Vessel. As such, the relevant inquiry is not whether the parties to the supply contract had authority to bind the Vessel owner, but whether the parties had the authority to bind the *Vessel.* Generally, in a maritime lien case, the vessel itself is viewed as the obligor, regardless of whether the vessel's owner is also obligated. *See Amstar Corp. v. S/S ALEXANDROS T.,* 664 F.2d 904, 908–09 (4th Cir.1981); *see also Black's Law Dictionary* 943 (8th ed. 2004) ("[The maritime lien] arises by operation of law and exists as a *claim upon the property,* secret and invisible.") (quoting Griffith Price, *The Law of Maritime Liens* 1 (1940)) (emphasis added). *Triton Marine Fuels Ltd., S.A. v. M/V PACIFIC CHUKOTKA,* 575 F.3d 409, 413–14 (4th Cir. 2009).

Generally, a fuel broker dealing exclusive on behalf of the Vessel, would have had the presumptive authority to bind the Vessel. This is because it is a fundamental tenet of maritime law that "[c]harterers and their agents are presumed to have authority to bind the vessel by the

ordering of necessaries." *Trans–Tec,* 518 F.3d at 1127–28. The Fourth Circuit has held that "[i]f it were not so, charterers could not stray far from a ship's owner for fear of being stranded by their inability to secure fuel, repairs or other necessaries." *Triton Marine Fuels Ltd., S.A. v. M/V PACIFIC CHUKOTKA,* 575 F.3d 409, 414 (4th Cir. 2009). Similar to *Triton Marine,* in this case, MedMar's presumptive authority was not diminished by the existence of a "no lien" clause in Autumn Harvest's charter party because there is nothing in the record to suggest that Plaintiff had actual knowledge of that provision. *See id.* at 1129.

However, consistent with Fourth Circuit precedent in *Triton Marine,* a fuel broker can only establish a maritime lien on the Vessel if there are a "significant number of ties" to the vessel. *Id.* at 418. Accordingly, in this case, the Court concludes that Mr. Mylonakis did not have presumed authority to bind the Vessel to the provisions of the Bunker Confirmation. Thus, there is no presumed authority to establish a maritime lien.

## C. Plaintiff is Barred by Laches

Even if Plaintiff had a maritime lien on the Vessel because there was presumed authority, Plaintiff is barred by laches. As noted above, the Commonwealth of Virginia has a six-month limitation on the filing of liens after repairs of real property that is most analogous to the instant case. *See* Va. Code Ann. § 43-17.[3] This six-month limitation starts to run at the point when the debt becomes payable which "refers to the time when the obligation to pay is immediate, after which the debt is past due, interest runs and action may be brought." *S. Materials Co. v. Marks,* 196 Va. 295, 297 (1954) (citing *Dungan v. Henderlite,* 62 Va. (21 gratt.) 149; 70 C.J.S., payable,

---

[3] Pursuant to Va. Code Ann. § 43-17, "no suit to enforce any lien perfected under §§ 43-4, 43-5 and 43-7 to 43-10 shall be brought after six months from the time when the memorandum of lien was recorded or after sixty days from the time the building, structure or railroad was completed or the work thereon otherwise terminated, whichever time shall last occur; provided, however, that the filing of a petition to enforce any such lien in any suit wherein such petition may be properly filed shall be regarded as the institution of a suit under this section; and, provided further, that nothing herein shall extend the time within which such lien may be perfected."

p. 202). Additionally, "where a maritime lien is to be enforced to detriment of purchaser for value, without notice of the lien, defense of laches will be held valid under shorter time, and more rigid scrutiny of circumstances of the delay, than when claimant is owner at the time lien accrues." *Phelps v. The Cecelia Ann*, 199 F.2d 627 (4th Cir. 1952).

### 1. No Satisfactory Excuse for the Delay

First, the Court considers whether there is a satisfactory excuse for the delay in bringing the instant cause of action. At trial, Plaintiff's witness, Mr. Rasmussen testified that he was contacted by Mr. Mylonakis, a fuel broker, to enter into a contract to deliver fuel to the Vessel on behalf of MedMar Inc. Tr. 21:23-22:16. The contract was dated on June 28, 2019. Mr. Mylonakis was believed to be an employee or agent of a company called Windrose Marine. *See* Rasmussen 30(b)(6) Depo. at 25:19-26:1; *see also,* Tr. 63:10-15. Sing Fuels dealt exclusively with Mr. Mylonakis for this transaction. *Id.* at 26:10-14. During the inquiry period, Sing Fuels investigated MedMar and determined that they had low assets but still decided to extend a $1.6 million credit line. Tr. 51:24-52:12. The contract between Sing Fuels and MedMar indicated that MedMar would have 60 days to pay the amount owed after the fuel is delivered to the Vessel. Tr. 19:9-11; Tr. 52:17-19. According to Mr. Rasmussen, the 60-day period was an unusual long term because about 95 percent of customers usually have a 30-day period to pay. Tr. 52:17-53:6.

The initial bunker contract was completed in May 2019 for a fuel delivery worth approximately $300,000. Tr. 20:13-19. The fuel was successfully delivered, received by the Vessel, and Sing Fuels received pay for the bunkers. Tr. 20:23-24; Tr. 63:16-64:6. Yet, as noted above, Mr. Rasmussen admitted that it was not clear whether MedMar Inc. paid for the fuel. Tr. 69:17-20. Then, Sing Fuels and Mr. Mylonakis, a fuel broker acting presumably on behalf of MedMar Inc., reached another agreement on June 28, 2019 for the supply of 950 – 1050 metric

tons of bunkers to the Vessel to occur on or about July 5-6, 2019, at the Outer Port Limits of Port Elizabeth, South Africa. Trial Ex. 1. On July 10, 2019, 595.888 metric tons of 380 centistokes (cst) bunker fuel was delivered to the Vessel at Port Elizabeth, South Africa. Trial Ex. 4; Tr. 55:14-19. On July 12, 2019, an additional 459.038 metric tons of 380 cst bunker fuel was delivered to the Vessel at Port Elizabeth, South Africa. Trial Ex. 5. In total, 1049.29 metric tons of 380 cst bunker fuel (the "Bunker Fuel") was delivered to and accepted by the Vessel while at anchorage at or near Port Elizabeth, South Africa. Sing Fuels invoiced MedMar for the bunkers to be paid on or before September 9, 2019 in the amount of $532,312.48. Tr. 31:7-21.

The evidence shows that Sing Fuels does not have a satisfactory excuse for the delay in bringing the cause of action. Mr. Rasmussen testified at trial that after MedMar defaulted, Sing Fuels started to regularly track the Vessel after October 2019 and determined that after departing South Africa the Vessel was in India and then the United Kingdom. Tr. 58:3-14; Tr. 58:25-59:11; Tr. 70:4-6. Mr. Rasmussen also testified that Sing Fuels had opportunities to arrest the Vessel at various ports before it arrived in the United States. Tr. 59: 12-15. However, Sing Fuels elected not to arrest the Vessel in other ports based on their discussions with their lawyers. Tr. 59:22-25. Mr. Rasmussen further testified that Sing Fuels received notice from the owners of the Vessel, Autumn Harvest, that they were not paying for the fuel. Tr. 60: 9-25. Although Sing Fuels knew that it had a basis for establishing a maritime lien on the Vessel at the time of delivery when there was no payment and that they could arrest the Vessel as early as October, they delayed because they were seeking a "commercial option" to resolve the issue. Tr. 61:1-20. Then in February 2020, while the Vessel was still not in the United States, Plaintiff met with the Vessel's owners who clarified again that they were not going to pay for the fuel. Tr. 62: 1-22. Again, Sing Fuels had another opportunity to arrest the Vessel, but Sing Fuels did not.

The Court finds that Plaintiff had multiple opportunities to arrest the Vessel and bring the instant lawsuit because Plaintiff knew where the Vessel was docked and knew, as early as October 2019 and as late as February 2020, that Autumn Harvest was not going to pay for the fuel. Tr. 59:8-15 (Mr. Rasmussen admitting that Plaintiff were actively tracking the Vessel's whereabouts.).

Additionally, Plaintiff admitted that they knew that they had a maritime lien on the Vessel as early as October 2019. Hence, Sing Fuels could have arrested the Vessel in the United Kingdom immediately after the maritime lien was in effect in October 2019. Tr. 59:3-7.  In fact, Sing Fuels could have arrested the vessel in "any number of ports" between October 2019 and February 2020. Tr. 59:8-15. Moreover, even after Autumn Harvest confirmed again that they were not going to pay for the fuel in February 2020, Plaintiff waited until April 2020 to arrest the Vessel when it was docked at a U.S. port. To Plaintiff's credit, Sing Fuels "hoped that [it] could settle without the need of arrest." Tr. 56:2-3. However, for the purposes of the first laches element, the Court finds that Sing Fuels had multiple opportunities to take earlier legal action during the six-month limitations period, yet Sing Fuels did not.

### 2.  Unfair Prejudice to Defendant

Second, the Court considers whether allowing the action to go forward despite the delay would unfairly prejudice the defendant. Regarding prejudice, courts have held that the defense of laches does not apply when "… where the parties were engaged in a continuous effort to adjust matters between themselves until the claimants were finally brought into these causes, with a view of lawfully determining their rights." *Virginia Shipbuilding Corp. v. U.S. Shipping Bd. Emergency Fleet Corp.,* 11 F.2d 156, at 160 (E.D. Va. 1925); *see also, Larios v. Victory Carriers, Inc.,* 316 F.2d 63, 66 (2d Cir. 1963) ("When the suit has been brought after the

expiration of the state limitation period, a court applying maritime law asks why the case should be allowed to proceed; when the suit, although perhaps long delayed, has nevertheless been brought within the state limitation period, the court asks why it should not be.")

The Court finds that allowing the suit to proceed would prejudice the Defendant. First, as noted above, Defendant informed Plaintiff as early as October 2019 and as late as February 2020 that Autumn Harvest was not going to pay for the bunker fuel. Tr. 59:8-15. At best, Plaintiff argues that between October 2019 to February 2020, they were seeking a "commercial resolution" to the matter without an arrest. Tr. 61:12-20. Therefore, Plaintiff argues that they did not prejudice Defendant by waiting until April 2020 to bring the instant suit. However, the Court finds otherwise. In trial, Mr. Rasmussen, testified that after Plaintiff met with Autumn Harvest in February 2020, it became clear that Autumn Harvest was not going to pay for the bunker fuel because Defendant maintained that they were not liable. Tr. 62:1:18. At this time, the Vessel was in Dubai and Plaintiff knew that they could arrest the Vessel in February 2020. *See* Tr. 62:19-22 ("The Court: So when they told you that in February 2020, you had the option, again, to arrest that vessel wherever it was; THE WITNESS: Yes."). Furthermore, Mr. Rasmussen testified that they learned in September 2020 that MedMar was having financial difficulties which indicated their inability to pay for the bunker fuel, but Sing Fuels did not seek to arrest the Vessel at the time. Tr. 56:4-11. In all, Plaintiff waited more than nine months after the maritime lien arose and more than three months after meeting with Defendant in February 2020 to bring the suit.

Based on the peculiar circumstances of this case, the Court finds that it is appropriate to apply a six-month statute of limitations pursuant to Va. Code Ann. § 43-17. The statute of limitations for enforcing a maritime lien starts to run at the point when the debt becomes payable which "refers to the time when the obligation to pay is immediate, after which the debt is past

due, interest runs and action may be brought." *S. Materials Co. v. Marks*, 196 Va. 295, 297 (1954) (citing *Dungan v. Henderlite,* 62 Va. (21 gratt.) 149; 70 C.J.S., payable, p. 202). Moreover "where maritime lien is to be enforced to detriment of purchaser for value, without notice of the lien, defense of laches will be held valid under shorter time, and more rigid scrutiny of circumstances of the delay, than when claimant is owner at the time lien accrues." *Phelps v. The Cecelia Ann*, 199 F.2d 627 (4th Cir. 1952).

The Court weighs factors of equity in favor of the Defendant. *See DeSilvio v. Prudential Lines, Inc.,* 701 F.2d 13, 15 (2d Cir.1983) ("[A] district court may not mechanically apply the local statute of limitations as equity eschews mechanical rules; it depends on flexibility."). First, Sing Fuels was not diligent in investigating MedMar Inc. before finalizing the contract with Mr. Mylonakis for the bunker fuel. As detailed above, Sing Fuels dealt exclusively with Mr. Mylonakis in negotiating the deal for the bunker fuel. However, Mr. Mylonakis revealed later that he never had direct communications with MedMar regarding these bunkers. Mr. Mylonakis further revealed he was only dealing with M.A.C. Shipping and that he believed they were the same as MedMar. Nevertheless, Sing Fuels did not confirm the relationship between M.A.C. Shipping and MedMar Inc. Tr. 47:2-48:3. As noted above, nothing in the record suggests that M.A.C. Shipping is the same company as MedMar. Inc. *Cf. World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co.,* 783 F.3d 507, 516 (4th Cir. 2015).

After a request to meet with Sing Fuels, MedMar refused which Mr. Rasmussen said was surprising. Tr. 48:4-17. Second, during the inquiry period, Sing Fuels investigated MedMar and determined that they had low assets but still decided to extend a $1.6 million credit line. Tr. 51:24-52:12. Sing Fuels also provided MedMar with 60 days to pay the amount owed after the fuel was delivered to the Vessel. Tr. 19:9-11; Tr. 52:17-19. According to Mr. Rasmussen, the 60-

day period was an unusually long term because about 95 percent of customers usually have a 30-day period to pay. Tr. 52:17-53:6. Third, Sing Fuels in its own Terms and Conditions recognizes that a six-month limitation to bring claims is fair. For example, paragraph 14.7 of the Sing Fuels' Terms and Conditions requires that the buyer bring any claims against Sing Fuels within six months. *See* Trial Exhibit 3. In trial, Mr. Rasmussen testified that he considers this term to be "fair." Tr. 55:5-11. Fourth, Plaintiff submitted the Deposition Testimony of Elango Subbiah who explained that the Vessel's owner could not resolve the issue of the unpaid bunkers with the charterers in January of 2020 because "the charter party does not allow me to demand, okay, pay me this money, unless we have a clear-cut answer." Depo Tr. at 75:19-21. Claimant could not address these bunkers in the final hire statement because Sing Fuels had not timely arrested the vessel or filed its claim. Fifth, and as noted above, the record shows that while Plaintiff could have arrested the Vessel at multiple ports after the maritime lien arose, they decided to wait until the Vessel was in the United States. Tr. 60:1-61:17.

Overall, based on principles of equity, the Court finds that the six-month statute of limitations appropriately applies in this case. Thus, Defendant is entitled to a presumption that they have been prejudiced by the delay. *Giddens v. Isbrandtsen Co.*, 355 F.2d 125, 127 (4th Cir. 1966). The aforementioned factors of equity are the kind of prejudice that laches is intended to prevent. *Leopard Marine & Trading, Ltd. v. Easy St. Ltd.*, 896 F.3d 174, 198 (2d Cir. 2018). Moreover, Plaintiff did not submit evidence or testimony at trial to undermine Defendant's prejudice claim or to overcome the presumption. Therefore, the presumption stands, and laches bars Plaintiff from bringing this suit. *See id.*

## VII.   CONCLUSION

By a preponderance of the evidence, Defendant has demonstrated that there is no privity of contract between plaintiff and defendant which holds defendant liable for a maritime lien. In the alternative, the Court also finds that Defendant's affirmative defense of laches applies. Accordingly, the Court enters Judgment in favor of the Defendant and against the Plaintiff.

The Clerk is **DIRECTED** to electronically provide this Order to all parties.

**IT IS SO ORDERED**

Newport News, Virginia
April *19*, 2021

UNITED STATES DISTRICT JUDGE